**OHIO STUDENT LOAN COMMISSION, Plaintiff,**

v.

**Lauro F. CAVAZOS, Secretary of the United States Department of Education, et al., Defendants.**

No. C–2–88–314.

United States District Court,
S.D. Ohio, E.D.

Dec. 19, 1988.

On Motion for Relief from
Judgment March 10, 1989.

Anthony J. Celebrezze, Jr., Ohio Atty. Gen., Kevin L. Shoemaker, Price, Berry & Shoemaker, Lawrence J. Miltner, Asst. Atty. Gen., Columbus, Ohio, for plaintiff.

Neil Koslowe, Sp. Litigation Counsel, Civ. Div., Dept. of Justice, Washington, D.C., James E. Rattan, U.S. Attys. Office, Columbus, Ohio, for defendants.

## OPINION AND ORDER

### GRAHAM, District Judge.

Plaintiff Ohio Student Loan Commission ("OSLC") filed this action against defendants William J. Bennett, Secretary of the United States Department of Education ("Secretary") and the United States Department of Education ("Department"), seeking declaratory relief. Lauro F. Cavazos, successor in office to William J. Bennett, has been substituted as a party defendant, in his capacity as Secretary of the United States Department of Education.

In its complaint, the OSLC asserts six claims. The OSLC contends that the defendants' recovery of excess cash reserves from the OSLC's reserve fund pursuant to 20 U.S.C. § 1072(e) (Supp.1988) (effective Dec. 22, 1987) constitutes (1) a taking of contractual rights without just compensation in violation of the Fifth Amendment to the United States Constitution, (2) a taking of non-federal monies without just compensation in violation of the Fifth Amendment, (3) a questioning of the validity of the public debt of the United States in violation of the Fourteenth Amendment, (4) an unreasonable and arbitrary action in violation of the Fifth Amendment, (5) an arbitrary classification of state guaranty agencies to which the recovery provisions are applicable in violation of the Fifth Amendment, and (6) a breach of the contracts between the parties.

### PROCEDURAL BACKGROUND

The OSLC filed its complaint on March 15, 1988. On May 13, 1988, the defendants filed a motion to dismiss on the grounds that the OSLC had failed to exhaust available remedies pursuant to the waiver provisions of 20 U.S.C. § 1072(e)(3)(A). This motion was rendered moot by a joint stipulation filed by the parties on June 23, 1988. On May 13, 1988, the defendants also filed a motion to transfer the case to the United States District Court for the District of Columbia. On August 12, 1988, the Hon. Mark R. Abel, United States Magistrate, issued an order denying the motion to transfer.

On September 9, 1988, the OSLC filed an application for a temporary restraining order and preliminary injunction seeking to enjoin the defendants from implementing the cash recovery provisions of 20 U.S.C. § 1072(e). On the same day, the Court held a preliminary informal conference on the application pursuant to S.D.Ohio R. 3.7.1 and, at the conclusion thereof, orally denied the application for temporary restraining order and set a preliminary injunction hearing for Wednesday, October 12, 1988. A written order was filed on September 13, 1988 incorporating these rulings. The hearing on the application for preliminary injunction was subsequently consolidated with trial on the merits pursuant to Fed.R.Civ.P. 65(a)(2) and the hearing date re-scheduled for Monday, November 7, 1988. Pursuant to the final pretrial order, the OSLC withdrew its application for preliminary injunction. The trial on the merits took place on Monday, November 7, 1988. Mr. David Harmon, who was employed by the OSLC for thirteen years until June of 1988, the last three years as executive director, and Dr. James Biddle, executive director of the OSLC since June 13, 1988, testified on behalf of the plaintiff. The

defendants did not call any witnesses. The matter is now ripe for decision.

## STATEMENT OF FACTS

The Ohio Higher Education Assistance Commission ("OHEAC") was created by the Ohio General Assembly in 1961 and began operations in 1962. The OHEAC was originally funded solely with state appropriations and was designed to administer state programs to assist Ohio residents attending institutions of post-secondary education. In particular, the OHEAC guaranteed loans made by private lenders to certain eligible students.

Three years later, the United States Congress created the Guaranteed Student Loan Program pursuant to the Higher Education Act of 1965, as amended, 20 U.S.C. § 1071 *et seq.* The purpose of this program was to encourage states and nonprofit organizations and institutions to establish student loan guaranty programs, to provide a federal guaranty program for those students not having reasonable access to state or private guaranty programs, to subsidize interest payments on student loans, and to reinsure state and private guaranty programs. 20 U.S.C. § 1071(a). In response to this federal program, the Ohio General Assembly created the OSLC, pursuant to Chapter 3351 of the Ohio Revised Code, as a successor to the OHEAC. The creation of such a commission was authorized by Article VI, Section 5 of the Constitution of the State of Ohio.

The OSLC is a state agency created for the administration of Ohio's student loan guaranty program. The OSLC is authorized to enter into contracts and to sue and be sued in its own name. O.R.C. § 3351.07. In addition, O.R.C. § 3351.07(A)(2) expressly states "that no obligation of the commission shall be a debt of the state, and the commission shall have no power to make its debts payable out of moneys except those of the commission." The OSLC is also expressly authorized to accept federal funds and to enter into contracts pursuant to the Higher Education Act of 1965, as amended, 20 U.S.C. § 1071 *et seq.* O.R.C. § 3351.13.

The OSLC was originally funded by state appropriations, guarantee premiums charged to lenders and passed on to student borrowers, interest and other investment income, and the assets of the OHEAC which were transferred to the OSLC. The sources of funds now held by the OSLC are the original state appropriations, the guarantee premiums, federal administrative cost allowances received from the federal government, federal reinsurance payments received from the federal government, service fees from lenders and schools, thirty percent of the total amount collected on defaulted loans, and interest and investment income. *See* Defendants' Exhibit "D" at 11. Although the OSLC retained certain federal advances in its reserve fund as of September 30, 1986, there is some question as to whether these advances have been repaid.

The state appropriations predate 1967 and total approximately $976,000. The guarantee premiums are charged by the OSLC to lenders as a fee for guaranteeing student loans. State guaranty agencies such as the OSLC are authorized by 20 U.S.C. § 1078(b)(1)(H) to collect a guarantee premium on each loan not to exceed three percent of the principal amount. This premium can be passed on by the lender to the student borrower. The OSLC charges one percent of the principal amount.

The OSLC also receives administrative cost allowances from the federal government pursuant to 20 U.S.C. § 1078(f). This provision authorizes the Secretary of Education to pay administrative cost allowances to state guaranty agencies in order to compensate them for the costs of administering the Guaranteed Student Loan Program. The total amount of administrative cost allowances to be paid to a state guaranty agency during any fiscal year is to be equal to one percent of the total principal amount of the loans guaranteed by the agency during that fiscal year. 20 U.S.C. § 1078(f)(1)(B). Prior to December 22, 1987, this statutory provision stated that "[t]he guaranty agency shall be deemed to have a *contractual right* against the Unit-

ed States to receive payments" of administrative cost allowances. (Emphasis added).

Another form of federal funding received by the OSLC is federal reinsurance payments pursuant to 20 U.S.C. § 1078(c). The Secretary of Education is authorized to enter into guaranty agreements with state guaranty agencies whereby the Secretary agrees to reimburse the agencies for losses they sustain due to defaults by student borrowers. 20 U.S.C. § 1078(c)(1)(A). When a student defaults, the lender files a claim with the OSLC for reimbursement of the balance remaining on the loan obligation. The OSLC pays the lender out of its reserve fund and then files a claim with the Department of Education for reinsurance. According to 20 U.S.C. § 1078(c)(1)(B), if a state guaranty agency's default rate is five percent or less of the total amount of loans insured by the agency, the Department of Education will reimburse the agency on one hundred percent of the defaults. However, if the default rate is between five and nine percent, then the Department will only reimburse the agency on ninety percent of the defaults and if the default rate exceeds nine percent, the Department will reimburse the agency on only eighty percent of the defaults. One hundred percent reinsurance first became available in 1976, and the OSLC has qualified for that level of reinsurance from that time to the present. The parties agree that the OSLC has incurred more administrative costs and has paid more funds for defaulted student loans since 1965 than the federal government has reimbursed the OSLC with administrative cost allowances and reinsurance payments. Stipulation of Facts at Paragraphs 4, 5.

The OSLC also receives fees for services rendered to lenders and schools. If the lender so elects, the OSLC will service the loans issued by the lender and guaranteed by the OSLC. In addition, the OSLC disseminates information concerning the Guaranteed Student Loan Program and trains employees of lenders and schools. Any fees collected for these and other miscellaneous services are deposited in the reserve fund.

Another source of funds for the OSLC is derived from collections on defaulted loans. If a state guaranty agency collects on a defaulted student loan for which it has already reimbursed the lender and for which it has received reinsurance from the Department of Education, the agency may retain thirty percent of the collected payments for costs incurred in administering the program, in particular its default collection and prevention efforts. 20 U.S.C. § 1078(c)(6). Finally, the interest and other investment income generated by all these funds are retained in the OSLC's reserve fund. All of these funds are held in an unsegregated reserve fund.

Pursuant to the authorization of O.R.C. § 3351.13, the OSLC has in fact entered into contracts with the United States Department of Education whereby the OSLC has become a participatory state guaranty agency in the Guaranteed Student Loan Program. The contracts entered into by the parties are the 80% Agreement: Agreement for Federal Reinsurance of Loans Pursuant to 428(c) of the Higher Education Act of 1965, as amended; the 100% Agreement: Supplemental Guaranty Agreement for Federal Re-insurance of Loans, Higher Education Act of 1965, as amended; and the Permanent Agreement. In exchange for the OSLC's administration of and compliance with the statutory and regulatory requirements of the Guarantee Student Loan Program, the federal government agreed to reinsure the OSLC pursuant to the Agreement for Federal Reinsurance and the Supplemental Guaranty Agreement. According to the Agreement for Federal Reinsurance, the OSLC is entitled to 80% reinsurance on funds it spends to cover defaulted loans. According to the Supplemental Guaranty Agreement, the OSLC is entitled to 100% reinsurance, provided that the default rate on its guaranteed loans does not exceed five percent. The Permanent Agreement obligates the federal government to subsidize the interest rates charged by the private lenders.

The Guaranteed Student Loan Program involves five parties. The participants are the lender, the student borrower, the educational institution of higher learning, the

state guaranty agency, and the United States Department of Education. The student borrower who desires a guaranteed student loan first applies to a private lender and provides the educational institution with basic eligibility information. The typical repayment term of a guaranteed student loan is ten years, although some loans have a repayment term of up to twenty-five years. The state guaranty agency guarantees the loan by agreeing to reimburse the lender in whole or in part for any loans upon which the student borrower defaults. The state guaranty agency also collects guarantee premiums from the lender which are passed on to the student borrowers. The Department approves the participation of schools, lenders, and guaranty agencies, and administers the program generally. The Department reimburses the state guaranty agencies for outlays they make to lenders to cover defaulted student loans and the Department reimburses the state guaranty agencies for certain administrative costs incurred in administering the program. The Department also makes direct payments to lenders in order to subsidize the interest payments while the students are in school and during a six-month grace period thereafter and to supplement the loan's interest rate. United States General Accounting Office, *Guaranteed Student Loans: Better Criteria Needed for Financing Guarantee Agencies,* 9–11 (1986).

The arrangement which is presently in effect between the OSLC and the Department of Education was formalized by contractual agreements during 1977 pursuant to the Higher Education Act of 1965, as amended, 20 U.S.C. § 1071 *et seq.* Pursuant to the 100% Agreement: Supplemental Guaranty Agreement for Federal Re-insurance of Loans, Higher Education Act of 1965, as amended, Clause 2, the parties agreed as follows:

> The commissioner [now secretary of the Department of Education] *shall reimburse* the Agency, at such times, in such manner, and on the basis of such documentation as he may from time to time reasonably prescribe, with respect to losses (resulting from the default of student borrowers ...) on the unpaid balance of the principal and accrued interest of any student loan issued under the Agency's Student Loan Insurance Program in an amount equal to one hundred per centum (100%) of the amount expended by the Agency in the discharge of its insurance obligations incurred under its Student Loan Insurance Program. (Emphasis added).

As discussed *supra,* the Secretary was authorized to enter into this agreement and create contractual rights in the OSLC pursuant to 20 U.S.C. § 1078(c)(1)(A).

The OSLC has entered into agreements with the federal government to act as its agent in administering the Guaranteed Student Loan Program. The OSLC entered into these agreements in its own name. The primary functions of the OSLC as a participatory state agency in the Guaranteed Student Loan Program are to guarantee student loans, to review loan applications, to avert defaults, and to review defaults. In order to participate in the Guaranteed Student Loan Program, the OSLC must comply with all of the requirements set forth in the Higher Education Act of 1965, as amended, 20 U.S.C. § 1071 *et seq.* and the regulations promulgated thereunder. In addition, the OSLC also performs functions over and above what the federal law requires of state guaranty agencies. In particular, the OSLC provides information to families concerning the program and trains employees of schools and lenders regarding their participation in the program. These additional efforts have been a significant factor in the OSLC's low default rate.

On December 22, 1977, Congress enacted the Omnibus Budget Reconciliation Act of 1987. Portions of the Omnibus Budget Reconciliation Act of 1987 amended the Higher Education Act of 1985 to limit the amount of cash reserves that a state guaranty agency could accumulate. In particular, 20 U.S.C. § 1072(e)(1) was enacted to limit cash reserves to the greater of:

> (A) 40 percent of the total amount paid by that agency on insurance claims during the preceding fiscal year;

(B) 0.3 percent of original principal amount of loans that are insured by that agency and that are outstanding at the end of such preceding fiscal year;

(C) an amount which, when combined with all other parts of total agency reserves, equals 0.4 percent of such original principal amount;

(D) $500,000; or

(E) the amount required to comply with the reserve requirements of a State law as in effect on October 17, 1986.

The Secretary was required to determine by March 31, 1988 the excess cash reserves each state guaranty agency had for fiscal year 1986. 20 U.S.C. § 1072(e)(2). The total reduction of excess cash reserves for all state agencies was limited to $250,000,000 in fiscal year 1988. 20 U.S.C. § 1072(e)(4). Once the Secretary determined that an agency had excess cash reserves, he was to direct the agency to reduce the reserves:

(A) by repaying any advances to such agency made by the Secretary under this section that are not required to be repaid under subsection (d) of this section;

(B) by withholding and cancelling claims for reimbursement otherwise payable under section 1078(c)(1) of this title;

(C) by reducing the amount of payments for which application will be made by such agency under section 1078(f) of this title; or

(D) by any other method of reducing payments from or increasing payments to the Federal Government, including payment of additional reinsurance fees in addition to the fees required by section 1078(c)(9) of this title, as proposed by the agency and agreed to by the Secretary.

20 U.S.C. § 1072(e)(2). The excess cash reserves recovered were to be deposited into the Department's student loan insurance fund established for satisfaction of the Department's guarantee obligations. 20 U.S.C. § 1081(a). The Court notes that the cash recovery provisions of 20 U.S.C. § 1072(e) were prospectively repealed effective September 30, 1989 by the same legislation that enacted them.

After the excess cash recovery provisions had been enacted but before being contacted by the Department of Education, David Harmon sent a letter dated February 1, 1988 to the Secretary of the Department of Education. Therein, Harmon expressed the position of the OSLC in regard to the newly enacted 20 U.S.C. § 1072(e) stating that it considered the contracts between the parties to be valid and binding and any attempt to recover excess cash reserves from the OSLC would be a repudiation of the contracts between the parties. David Harmon subsequently received a letter from the Department dated February 9, 1988, advising the OSLC of the cash recovery provisions and informing the OSLC that it was determined to have $26,075,259 in excess cash reserves. This figure was reached by utilizing 20 U.S.C. § 1072(e)(1)(E), the minimum amount required by state law to be kept in the reserve fund. The letter also stated that the OSLC must choose a means of payment by February 29, 1988 or else a method of payment would be chosen for it. The deadline was later extended to March 15, 1988.

The OSLC failed to elect a method for reducing excess cash reserves but the Department did not seek to implement the cash recovery provisions against the OSLC until September 8, 1988. The OSLC rejected the September 8, 1988 implementation by the defendants on the grounds that it breached the contracts between the parties and did not accurately determine the adequacy of the OSLC's reserve fund. The defendants have refused to pay reinsurance claims which the OSLC has submitted from April, 1988 until the present. This withholding of funds has been without distinction as to whether the reinsurance relates to loans made before or after December 22, 1987, the effective date of the excess cash recovery provisions.

The defendants now allege that the excess cash recovery provisions are in the nature of an additional reinsurance fee, rather than the recovery of federal monies already paid to the OSLC. In response to this allegation, the OSLC contends that this representation had never been made to them before. Mr. Harmon testified that in

all of his dealings with the defendants he never heard that 20 U.S.C. § 1072(e) was a fee for the defendants providing reinsurance. In addition, the defendants have not brought to the Court's attention any mention of a reinsurance fee in the legislative history or General Accounting Office reports regarding the excess cash recovery provisions. Dr. Biddle also testified that the defendants never in the past represented that the cash recovery provisions were a reinsurance fee. Neither have the defendants mentioned any changes in the contracts between the parties or in the methods of compensation.

## LEGAL ANALYSIS

The Court must consider whether there was a valid binding contract between the parties regarding reinsurance payments, whether the excess cash recovery provisions of 20 U.S.C. § 1072(e) breached that contract, and whether that breach was unlawful or violative of the Constitution of the United States. As discussed, *supra,* the parties entered into agreements during 1977 by which the OSLC agreed to administer the federal Guaranteed Student Loan Program and to comply with all the statutory and regulatory requirements thereof. In turn, the defendants agreed to reinsure the OSLC on 100% of the losses it incurred due to its guarantee obligations on defaulted student loans.

 These agreements were authorized by 20 U.S.C. § 1078(c). Although rights conferred by statute are generally not contractual in nature, Congress can create contractual rights binding on itself if it clearly indicates that intention. *National R.R. Pass. Corp. v. Atchison, Topeka & Sante Fe Ry. Co.,* 470 U.S. 451, 466, 105 S.Ct. 1441, 1451, 84 L.Ed.2d 432 (1985); *Dodge v. Board of Education,* 302 U.S. 74, 78, 58 S.Ct. 98, 100, 82 L.Ed. 57 (1937). In the instant case, Congress clearly intended to create contractual rights between the federal government and the OSLC. Prior to December 22, 1987, 20 U.S.C. § 1078(c)(1)(A) provided that "[t]he guaranty agency shall be deemed to have a *contractual right* against the United States,

*during the life of such loan,* to receive reimbursement according to the provisions of this subsection." (Emphasis added). On December 22, 1987, this provision was amended so that "[t]he guaranty agency shall, *subject to section 1072(e) of this title,* be deemed to have a contractual right against the United States...." (Emphasis added). Effective September 30, 1989, however, the amendment shall be repealed and this additional language stricken. Section 3002 of the Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100-203, 1987 U.S.Code Cong. & Admin.News (101 Stat.) 1330-38.

The reinsurance agreements between the parties were in effect before December 22, 1987, and the OSLC, in reliance upon those agreements and 20 U.S.C. § 1078(c)(1)(A), entered into contracts with eligible private lenders. In exchange for the participation in the Guaranteed Student Loan Program, the OSLC obligated itself to reimburse the lenders on 100% of all defaulted loans. A major portion of the loans for which the OSLC presently has contractual guarantee obligations with lenders was originated prior to December 22, 1987. The Court concludes that the OSLC had a vested contractual right to reinsurance payments from the federal government on all of its guaranteed student loans originated prior to December 22, 1987.

It would appear that the defendants have breached the reinsurance contract by withholding reinsurance payments on claims made by the OSLC on defaults covered on loans originated prior to December 22, 1987. The defendants have withheld all payments on these claims since April, 1988, and have expressed their intention to continue the withholding until they have withheld $26,075,259 in what they consider excess cash reserves.

The Department of Education, however, contends that it has not breached the contracts between the parties, but has only charged the OSLC an additional fee for providing reinsurance. According to this argument, the withholding of reimbursement payments from the OSLC is not a breach of contract but merely a means by

which the OSLC may pay the additional reinsurance fee.

This argument is without merit. Although Congress had in the past assessed a reinsurance fee from state guarantee agencies, see 20 U.S.C. § 1078(c)(9), the instant assessment is of a totally different nature. The prior fee was expressly entitled a "reinsurance fee" and operated as such. The plain meaning of the statutory language clearly does not support a reinsurance fee characterization. If Congress had intended 20 U.S.C. § 1072(e) as simply an additional reinsurance fee, then it would appear to have been inconsistent in amending the reinsurance provisions of 20 U.S.C. § 1078(c)(1)(A) to be subject to the provisions of 20 U.S.C. § 1072(e). In addition, the amount of the § 1078(c)(9) reinsurance fee is related directly to the volume of loans being guaranteed by the state guaranty agency. The excess cash recovery provisions are not tied to the number or amount of loans being guaranteed; instead, they only relate to the amount of money in the fund. If Congress intended to create an additional reinsurance fee, the expected method of implementing such a fee would be to amend 20 U.S.C. § 1078(c)(9). Yet it is interesting to note that Congress amended 20 U.S.C. § 1078(c)(9) to be subject to the provisions of 20 U.S.C. § 1072(e). The silence of the legislative history and General Accounting Office reports also mitigate against a finding of a reinsurance fee. The Court concludes that the statutory provisions are clear and unambiguous and that 20 U.S.C. § 1072(e) was not intended as an additional reinsurance fee; it was instead, as discussed *infra,* an attempt to appropriate the funds of a state agency as a part of Congress's efforts to reduce the budget deficit.

■ Even if the Court were persuaded to adopt the defendants' characterization of 20 U.S.C. § 1072(e) as an additional reinsurance fee, this would run afoul of the "equal protection" aspects of the Due Process Clause of the Fifth Amendment. Although the Fifth Amendment does not contain an Equal Protection Clause, "it does forbid discrimination that is 'so unjustifiable as to

be violative of due process.'" *Schneider v. Rusk,* 377 U.S. 163, 168, 84 S.Ct. 1187, 1190, 12 L.Ed.2d 218 (1964), *quoting Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). In the absence of a fundamental interest, the test for determining whether a classification created by Congress violates the Due Process Clause is whether the classification is rationally related to a legitimate government interest.

In the instant case, 20 U.S.C. § 1072(e) is *de facto* applicable only to those state guaranty agencies which have accumulated excess cash reserves. The ability of an agency to generate excess cash reserves is a result of its efficient operation, ability and efforts to avert defaults on student loans, and wise investment of its resources. As demonstrated by the variable reinsurance levels of 20 U.S.C. § 1078(c)(1), Congress desires to discourage defaults on student loans. However, the excess cash recovery provisions are only applicable to agencies which have accumulated excess cash reserves, and thus, have presumably been successful in maintaining low default levels. Agencies which have been operated inefficiently and have high default rates are not required to pay anything to the federal government pursuant to the excess cash recovery provisions.

An anticipated purpose for an additional reinsurance fee would be to encourage inefficiently operated state guaranty agencies to improve their performance. At the least, it would be expected that an additional fee would be a fee assessed to all state agencies for the service provided by the federal government in reinsuring the guaranteed loans. The instant excess cash recovery provisions further neither legitimate governmental interest.

The underlying purpose for the excess cash recovery provisions was to reduce the federal budget deficit. This is obvious from the fact that these provisions were enacted as part of the Omnibus Budget Reconciliation Act of 1987, which was designed to further the ends embodied by the Gramm–Rudman–Hollings Act. In addition, the Congress placed a $250,000,000

ceiling on the amount of excess cash reserves that could be recovered during fiscal year 1988 and limited the duration of recovery to the period from December 22, 1987 to September 30, 1989.

Although Congress certainly has a legitimate governmental interest in reducing the federal budget deficit, indeed it is a highly laudable goal, the taking of the valid contractual rights of others is not a constitutionally permissible means to that end. Neither does the imposition of an irrational reinsurance fee bear a rational relationship to the reduction of the federal budget deficit. The defendants have not presented nor has this Court discovered any legitimate governmental interest rationally furthered by the excess cash recovery provisions. Therefore, even if 20 U.S.C. § 1072(e) were characterized as an additional reinsurance fee, it would violate the Due Process Clause of the Fifth Amendment.

The defendants also contend that the version of 20 U.S.C. § 1078(c)(1)(A) which was in effect prior to December 22, 1987 implicitly authorized Congress to change its provisions in any way, at any time. The statute granted "a contractual right against the United States, during the life of such loan, to receive reimbursement *according to the provisions of this subsection.*" (Emphasis added). The defendants argue that the latter clause allows Congress to modify the provisions of the subsection, and therefore, qualify in an unlimited manner the right to reimbursement. In particular, the defendants point out that Congress did amend the provisions of the subsection by making it "subject to section 1072(e) of this title."

This position is patently without merit. Certainly the phrase "according to the provisions of this subsection" referred to those provisions in effect at that time. The other provisions provided for the level of reimbursement, the distribution of amounts subsequently collected on defaulted loans, reinsurance fees, etc. Congress would not be able to retroactively amend these other provisions any more so than the provision creating contractual rights.

In addition, the defendants contend that they have not breached the reinsurance contract between the parties because they did not compel the OSLC to reduce its excess cash reserves by having its reinsurance claims withheld. They contend that the OSLC could have reduced its excess cash reserves by any other method provided by 20 U.S.C. § 1072(e)(2). This argument is also without merit. This is merely a circuitous means to collect funds from the OSLC. The Court must look to function over form. The other methods for reducing excess cash reserves represent other *de facto* payments by the OSLC which it is not obligated to pay contractually or statutorily, apart from the provisions of the excess cash recovery provisions. In effect, these other methods would be coerced payments which would function to satisfy the requirements of the excess cash recovery provisions. The result is the same: retroactive reduction of the funding which the federal government contractually agreed to provide for the OSLC in exchange for its administration of the Guaranteed Student Loan Program.

Finally, the defendants allege that Congress can unilaterally change the terms of contractual agreements into which the federal government has entered. In support of this proposition, the defendants cite *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986) and the *Sinking–Fund Cases*, 99 U.S. (9 Otto) 700, 25 L.Ed. 496, 504 (1879). Both cases are inapposite to the instant case. In the *Sinking–Fund Cases*, the Supreme Court expressly recognized that "[t]he United States are as much bound by their contracts as are individuals." 99 U.S. (9 Otto) at 719. However, Congress can in certain circumstances, impose conditions on future obligations under valid contracts. *Id.* at 721. In particular, the Supreme Court held that it was constitutionally permissible for Congress to regulate the amount to be paid by private companies into a sinking fund in order to ensure that the companies would have the funds to pay off their debts to the federal government upon maturity. The right of the companies to receive the full

amount of funds owed them for their services to the federal government in connection with building the transcontinental railroad was not impaired. *Id.* at 721–26.

In *Bowen,* Congress expressly and unambiguously retained the "'right to alter, amend, or repeal any provision'" of the legislation in question. 477 U.S. at 52, 106 S.Ct. at 2397, *quoting* 42 U.S.C. § 1304. Furthermore, the Supreme Court determined that no contractual rights had been created. 477 U.S. at 52, 106 S.Ct. at 2397. These cases are distinguishable from the instant case, which clearly involves valid contractual rights to reinsurance payments which the defendants have not honored.

■ The cash recovery provisions in the instant case therefore breach the valid reinsurance contract between the parties. "When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934). The repudiation by the federal government of a valid contract is a violation of the Due Process Clause of the Fifth Amendment unless necessary for the exercise of the federal police power or other overriding federal interests. *Id.* The Department of Education has demonstrated no important overriding interest; therefore, this Court holds that the defendants have breached their contract with the OSLC in violation of the Fifth Amendment.

■ The OSLC also contends that the defendants' repudiation of their contractual obligations constitutes a questioning of the public debt in violation of Section Four of the Fourteenth Amendment. "The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a State or a municipality or a citizen." *Perry v. United States,* 294 U.S. 330, 351, 55 S.Ct. 432, 435, 79 L.Ed. 912 (1935). Once the federal government creates binding contractual relations with another party, it is obligated to perform under the contract, and any repudiation thereof constitutes a questioning of the public debt. *Id.* Therefore, the federal government's recovery of funds which it was obligated and in fact paid to the OSLC constitutes an unconstitutional questioning of the public debt.

Therefore, the Court declares that the cash recovery provisions of 20 U.S.C. § 1078(e) are in violation of the Fifth and Fourteenth Amendments to the extent they operate to withhold funds from the OSLC on reinsurance of loans originated before December 22, 1987. The defendants are hereby enjoined from further withholding of such reinsurance payments to the OSLC or any other attempt at implementing the cash recovery provisions of 20 U.S.C. § 1078(e). The defendants are ordered to repay to the OSLC the funds which they have wrongfully withheld.

It is so ORDERED.

## ON MOTION FOR RELIEF FROM JUDGMENT

Defendants filed a motion to suspend injunction on January 6, 1989 and a motion for relief from judgment on January 11, 1989. The Court will consider the motion for relief from judgment first.

A motion for relief from judgment pursuant to Fed.R.Civ.P. 60(b)(1), (6) must be brought within the time for taking an appeal and is appropriate for seeking correction of a mistake of law. *Barrier v. Beaver,* 712 F.2d 231, 233–35 (6th Cir.1983). Defendants' motion is properly before the Court.

Defendants initially contend that the plaintiff Ohio Student Loan Commission ("OSLC") is not a "person" for the purposes of the Fifth Amendment, and therefore, the Court's holding that 20 U.S.C. § 1072(e) violated the due process rights of the OSLC was in error. The Court notes that, prior to the instant motion, the defendants did not raise or brief this issue at any time. In fact, the Court raised the issue *sua sponte* at trial. T. Tr. at 64. Counsel for the plaintiff explained that the OSLC was a separate entity from the State of

Ohio, and therefore, a "person" for purposes of the Fifth Amendment. T. Tr. at 64–65. The defendants made no response.

A State is generally not a "person" for purposes of the Fifth Amendment. *South Carolina v. Katzenbach*, 383 U.S. 301, 323–24, 86 S.Ct. 803, 816, 15 L.Ed.2d 769 (1966). The issue in the instant case, however, is whether the OSLC is sufficiently separate and distinct from the State of Ohio to enjoy the protection of the Due Process Clause of the Fifth Amendment.

The parties have not cited, nor has this Court discovered, any authority setting forth a standard for determining whether a government-related entity constitutes a "person" under the Fifth Amendment. The Court notes, however, that this determination would appear to be analogous to the determination of whether a government-related entity is entitled to the protection of State immunity under the Eleventh Amendment. If an entity is amenable to suit in federal courts, then it should logically be entitled to due process from the federal government. The United States Court of Appeals for the Sixth Circuit set forth a multifactor analysis for making this determination under the Eleventh Amendment as follows:

"[L]ocal law and decisions defining the status and nature of the agency involved in its relation to the sovereign are factors to be considered, but only one of a number that are of significance. Among the other factors, no one of which is conclusive, perhaps the most important is whether, in the event plaintiff prevails, the payment of the judgment will have to be made out of the state treasury; significant here also is whether the agency has the funds or the power to satisfy the judgment. Other relevant factors are whether the agency is performing a governmental or proprietary function; whether it has been separately incorporated; the degree of autonomy over its operations; whether it has the power to sue and be sued and to enter into contracts; whether its property is immune from state taxation, and whether the sovereign has immunized itself from responsibility for the agency's operations."

*Hall v. Medical College of Ohio at Toledo*, 742 F.2d 299, 302 (6th Cir.1984), *cert. denied*, 469 U.S. 1113, 105 S.Ct. 796, 83 L.Ed.2d 789 (1985), *quoting Blake v. Kline*, 612 F.2d 718, 722 (3d Cir.1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1112 (1980).

The OSLC is in fact a creature of the State of Ohio, empowered to promote education and to administer Ohio's student loan guaranty program. Ohio Rev.Code § 3351.05. It is authorized by statute to enter into contracts pursuant to programs under the Higher Education Act of 1965, as amended, 20 U.S.C. § 1071 *et seq.* Ohio Rev.Code § 3351.13. The OSLC is composed of nine members appointed by the governor of Ohio with the advice and consent of the Ohio senate. Ohio Rev.Code § 3351.06. The members, however, are not state officials, but representatives from colleges and universities, secondary schools, and approved lenders. *Id.* The OSLC is subject to examination and audit by the state auditor. Ohio Rev.Code § 3351.11. Upon dissolution, all remaining funds become "vested in the state and credited to the general revenue fund." Ohio Rev.Code § 3351.12. The parties differ over the significance of the fact that the OSLC is exempt from all state property and income taxes. Ohio Rev.Code § 3351.10. The OSLC contends that such an exemption would be unnecessary if the OSLC's property were the property of the state. In this regard, the Court notes that Art. XII, § 2 of the Ohio Constitution authorizes and governs the creation of state tax exemptions, as follows:

[G]eneral laws may be passed to exempt burying grounds, public school houses, houses used exclusively for any public worship, institutions used exclusively for charitable purposes, and public property used exclusively for any public purpose, but all such laws shall be subject to alteration or repeal.

The entities eligible for tax exemption are varied and are not all alter egos of the state. As pointed out by the Sixth Circuit

in *Hall,* 742 F.2d at 307, both alter egos and non-alter egos of states are frequently exempt from state taxation. In the instant case, this factor is not persuasive one way or the other.

The most significant factor in the instant case is that any judgment against the OSLC would not be paid out of the state treasury. Although the OSLC's operating fund is part of the state treasury, it is a separate fund used exclusively for expenses of the OSLC. Ohio Rev.Code § 3351.131. Ohio Rev.Code § 3351.07(A)(2) expressly states "that no obligation of the commission shall be a debt of the state, and the commission shall have no power to make its debts payable out of moneys except those of the commission." Furthermore, the funds appropriated from the state for the OSLC predate 1967 and constitute a small percentage of the total funds controlled by the OSLC. The remainder of the funds have been generated by investment and the OSLC's loan guarantee and administrative functions. The OSLC has the power to enter into contracts and to sue and be sued in its own name. Ohio Rev. Code § 3351.07. Moreover, the guarantee and administration of student loans is more in the nature of a proprietary, not a governmental, function. Therefore, the Court concludes that the OSLC is not an alter ego of the State of Ohio and is a "person" for purposes of the Fifth Amendment.

In addition, there is some indication that governmental entities are protected by the equal protection aspects of the Fifth Amendment Due Process Clause.

> While a city is not a citizen entitled to privileges and immunities under section 2 of Article IV, or section 1 of the Fourteenth Amendment, we would not consider that the issue (whether, for some purposes, such as a claim of discriminatory treatment affecting its finances, it might not be a "person" entitled to protection under the Fifth Amendment) was necessarily foreclosed by *South Carolina v. Katzenbach,* 383 U.S. 301, 323–324, 86 S.Ct. 803 [816], 15 L.Ed.2d 769 (1966).

*Aguayo v. Richardson,* 473 F.2d 1090, 1100–01 (2d Cir.1973), *cert. denied,* 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 101 (1974) (parentheses added) (finding no standing, however, for a city to raise procedural due process claims). *See also City of Sault Ste. Marie v. Andrus,* 532 F.Supp. 157, 167–68 (D.D.C.1980).

In any event, this Court's holding that the implementation of 20 U.S.C. § 1072(e) constituted an unconstitutional questioning of the public debt in violation of Section Four of the Fourteenth Amendment is a separate and independent ground for invalidating this cash recovery provision. The argument raised by the defendants in their motion for relief from judgment that this provision is merely an additional reinsurance fee is not novel and was clearly and thoroughly addressed in this Court's December 1, 1988 Opinion and Order.

The Court also notes that the OSLC has raised anew the argument that the cash recovery provisions constitute a taking of property without just compensation in violation of the Fifth Amendment. Although the Court did not address this theory in its original decision, it concludes that this is also a legitimate ground for its decision. Valid contract rights are property which cannot be taken by the federal government without just compensation, even when the aggrieved party is a state governmental entity. *United States v. 50 Acres of Land,* 469 U.S. 24, 31, 105 S.Ct. 451, 455, 83 L.Ed.2d 376 (1984); *Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934).

Therefore, the Court concludes that the defendants' motion for relief from judgment is without merit, and therefore it is DENIED.

The defendants' motion to suspend injunction pending appeal is likewise DENIED. Although the Court agrees that the instant case presents novel issues of significant constitutional import and that the invalidation of a statutory provision on constitutional grounds is an extreme measure not to be taken lightly, there is no indication that the defendants will be harmed in any way by the enforcement of this Court's judgment. If the OSLC is later required to pay the federal govern-

ment its excess cash reserves, there is no indication that the funds will not be available. The Court therefore declines to suspend its injunction pending appeal.

The Court would finally note that in the final paragraph of its December 19, 1988 Opinion and Order and in the judgment entered the same day, "20 U.S.C. § 1078(e)" should read "20 U.S.C. § 1072(e)."

Therefore, the Court concludes that the defendants' motion for relief from judgment is without merit, and therefore, it is DENIED.

It is so ORDERED.