OHIO STUDENT LOAN COMMISSION, Plaintiff–Appellee,

v.

Lauro F. CAVAZOS, Secretary of the United States Department of Education; and United States Department of Education, Defendants–Appellants.

Nos. 89–3168, 89–3238.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 5, 1989.

Decided April 2, 1990.

---

Kevin L. Shoemaker (argued), Lawrence J. Miltner, Asst. Atty. Gen., Office of the Atty. Gen., Columbus, Ohio, for plaintiff-appellee.

James E. Rattan, Asst. U.S. Atty., Office of the U.S. Atty., Columbus, Ohio, Harold Jenkins, Brian Siegel, Steven Winnick, Dept. of Educ., Neil H. Koslowe (argued), U.S. Dept. of Justice, Civil Div., Washington, D.C., for defendants-appellants.

Before KEITH, JONES and GUY, Circuit Judges.

NATHANIEL R. JONES, Circuit Judge.

Defendants-appellants, Lauro F. Cavazos, the Secretary of the Department of Education (DOE), and the DOE, appeal judgment and denial of Fed.R.Civ.P. 60(b) relief in this action challenging the constitutionality of certain 1987 Amendments to the Higher Education Act of 1965. For the following reasons, we reverse the grant of summary judgment.

I.

The Higher Education Act of 1965, as amended, 20 U.S.C. § 1071, *et seq.* (1982) (the Act), created the Guaranteed Student Loan Program (GSLP), which provides financial assistance to students seeking a college education. Under the GSLP, lenders—such as banks, savings and loans associations and credit unions—make low-interest loans to students. The Secretary subsidizes the loans, but the 58 state or private non-profit guaranty agencies actually guarantee payment of the loan to the lender. The guaranty agency in the matter before us, the Ohio Student Loan Commission (OSLC), then obtains reinsurance from the federal government.

The OSLC is a state agency created for the purpose of administering Ohio's student loan guaranty program. Ohio Rev. Code Chapter 3351 (Baldwin 1988). It is authorized to enter into contracts in its own name, and the state is not liable on its debts. Ohio Rev.Code § 3351.07. Initially, the OSLC received state appropriations totalling $967,000, but this funding ended in 1967. Currently, the OSLC receives funding from several sources. First, it receives reinsurance payments or reimbursements from the Secretary for losses sustained due to defaults by student borrowers under 20 U.S.C. § 1078(c). The amount of payments varies from 80 percent to 100 percent of

the total default, depending upon the agency's default rate. The OSLC has consistently recorded a default rate below 5 percent, and as such, has received reinsurance for the full amount of defaults. Second, the OSLC receives administrative cost allowances from the Secretary pursuant to 20 U.S.C. § 1078(f). This federal payment is to compensate the state agencies for the cost of administering the GSLP. The amount of administrative cost allowances in a year is equal to one percent of the total principal amount of the loans guaranteed. In 1986 Congress amended the Act, giving agencies such as the OSLC a "contractual right" to receive both reimbursements and administrative cost allowances. 20 U.S.C. § 1078.

Third, the OSLC takes in money from non-federal sources. When a student defaults on repayment of a loan, the OSLC, pursuant to its guaranty, pays the lender and in return receives the note. Thirty percent of any money recovered flows to the OSLC, and seventy percent goes to the Secretary, who reimburses the OSLC for its payments to the lender. In addition, the OSLC charges guarantee premiums to lenders as a fee for guaranteeing student loans. The OSLC charges one percent of the principal amount as its fee. Finally, the OSLC receives interest and other investment income from its money held in a reserve fund.

Under the authority of the Act, the Secretary and the OSLC have entered into several "reinsurance agreements" whereby the OSLC has become the participatory state agency in the GSLP for the Ohio region. Under these agreements, the Secretary reinsures the OSLC's guarantees in exchange for the OSLC's administration of the GSLP. Specifically, the OSLC reviews loan applications, averts defaults where possible, reviews defaults, and of course, guarantees the loans. The Permanent Agreement states that "[t]he agency shall be bound by all changes in the Act or Regulations in accordance with their respective effective dates." J.App. at 33.

On December 22, 1987, as part of the Omnibus Budget Reconciliation Act of 1987, Congress amended the Act to limit the amount of cash reserves that a state guaranty agency could accumulate. Pub.L. No. 100–203, 101 Stat. 1330–36 (1987). In particular, 20 U.S.C. § 1072(e)(1) establishes a formula for determining the maximum amount of funds a guaranty agency may accumulate in its reserve fund. An agency with "excess" reserves (more than the statutory maximum) must transfer the excess to the Secretary. Under 20 U.S.C. § 1072(e)(2), the Secretary can enforce the transfer through one of the following methods: (1) making to the federal government from the state guaranty agency advance payments that are otherwise not due; (2) withholding and cancelling reimbursement claims that are otherwise payable; (3) reducing claims for administrative cost allowances; (4) paying an additional reinsurance fee to the Secretary; or (5) any other acceptable method of reducing payments from or increasing payments to the Secretary. The Secretary deposits all amounts collected under 20 U.S.C. § 1072(e)(2) into the GSLP student loan insurance fund established by 20 U.S.C. § 1081(a). The provisions of 20 U.S.C. § 1072(e) terminated on their own accord on September 30, 1989. The 1987 Amendments also modified 20 U.S.C. § 1078(c), by adding that the "contractual right" of the state agency to the reimbursement payments and the administrative cost allowances are "subject to section 1072(e) [the excess reserve provisions] of this title." In addition, 20 U.S.C. § 1072(e)(3) authorizes the Secretary to waive the requirements of 20 U.S.C. § 1072(e)(2) if there has been a change in the economic circumstance of the agency or the loan insurance program.

The Secretary determined that the OSLC had excess reserves of $26,075,259.00. On February 1, 1988, the OSLC informed the Secretary that it would not turn over the excess reserves to the Secretary because it believed that the requirements of the 1987 Amendments violated the contract between the Secretary and the OSLC. On February 9, 1988, the Secretary advised the OSLC of its obligation under the Act to transfer the excess reserves, and on March 15, 1988, the OSLC filed suit in the United States Dis-

trict Court for the Southern District of Ohio, Judge James L. Graham presiding, seeking declaratory relief. Because the OSLC did not elect a method for transferring the excess reserves, the Secretary began withholding reinsurance claims on September 8, 1988. In response, the OSLC added a request for injunctive relief to its complaint. The OSLC's complaint alleged that section 1072(e) was unconstitutional because it constituted a taking of private property without just compensation as prohibited by the Fifth Amendment, a violation of the Due Process Clause, and a questioning of the public debt in violation of section four of the Fourteenth Amendment.

The district court ruled that the Secretary's withholding of the reinsurance funds breached the OSLC's contractual rights to the reimbursements. *Ohio Student Loan Commission v. Cavazos*, 709 F.Supp. 1411 (S.D.Ohio 1988). The court rejected the Secretary's characterization of the withholding of reimbursement payments as an additional reimbursement fee, noting that past reinsurance fees have been explicitly designated as such by Congress. *Id.* at 1418. The court concluded that the withholding of funds under section 1072(e) violates the Due Process Clause because abrogating a contract is not a "constitutionally permissible means" to the legitimate end of balancing the budget. *Id.* at 1419. The court also concluded that the Secretary's repudiation of the contract constitutes an unconstitutional questioning of the public debt under the Fourteenth Amendment because the Secretary is attempting to recover funds that it was obligated to pay to the OSLC.

In its denial of the motion for relief from judgment, the district court decided that the OSLC is a "person" entitled to the protection of the Due Process Clause. *Id.* at 1420–21. Additionally, the court noted that although it "did not address this theory [of taking of private property under the Fifth Amendment] in its original decision, it

conclude[d] that this is also a legitimate ground for its decision." *Id.* at 1422. The court continued: "Valid contract rights are property which cannot be taken by the federal government without just compensation, even when the aggrieved party is a state governmental entity." *Id.* On May 22, 1989, the parties agreed to allow the Attorney General of the State of Michigan to file an *amicus curiae* brief on behalf of the OSLC.

## II.

■■■■ The first issue is whether the required transfer of "excess reserves" under section 1072(e)(1) constitutes a taking of property in violation of the Fifth Amendment.[1] Issues of law, decided pursuant to summary judgment, are freely reviewable by this court. *Loudermill v. Cleveland Board of Education*, 844 F.2d 304, 308 (6th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 377, 102 L.Ed.2d 365 (1988). We examine first whether the excess reserves constitute "private property" and then whether there was any taking of that property.

## A.

■■■■ The OSLC contends that the approximately $26 million in excess reserves that it is required to transfer to the Secretary under section 1072(e) is "private property" under the takings clause. It relies upon *United States v. 50 Acres of Land,* 469 U.S. 24, 31, 105 S.Ct. 451, 455, 83 L.Ed.2d 376 (1984), in which the Supreme Court stated that the "reference to 'private property' in the Takings Clause of the Fifth Amendment [encompasses] the property of state and local government when it is condemned."

The Secretary argues that the excess reserves are not the "private property" of the OSLC for three reasons. First, the OSLC is a federal agent, carrying out the federal wishes in its administration of the

---

1. At the end of its reply brief, the Secretary argues that the takings issue was not properly before the district court because the Tucker Act requires claims for more than $10,000 to go before the Court of Claims. Reply Brief of Appellants at 15. However, the Tucker Act is inapplicable because the OSLC is asking for declaratory and injunctive relief, not monetary damages.

GSLP. Second, the Secretary argues that the OSLC does not have free use and enjoyment over the property, and as such, the OSLC is more the custodian than the owner of the funds. Third, the Secretary contends that the OSLC does not have any property rights to the excess reserves because it comes from sources other than the federal reimbursements.

In *Amen v. City of Dearborn*, 718 F.2d 789, 794 (6th Cir.1983), *cert. denied*, 465 U.S. 1101, 104 S.Ct. 1596, 80 L.Ed.2d 127 (1984), this court noted that "the definition of property is broad, encompassing the entire group of rights incidental to ownership." While there is a significant amount of federal regulation of the funds, the OSLC still has some of the rights of ownership. The OSLC performs services concerning the initial loans and the recovery of defaults. To this extent, it is incorrect to label the OSLC merely a "federal agent" for funds to flow through. However, there are significant federal limitations upon receipt and use of the funds.

In *Dayton–Goose Creek Railway v. United States*, 263 U.S. 456, 44 S.Ct. 169, 68 L.Ed. 388 (1924), Congress amended the Transportation Act, fixing rates to ensure that the railroad companies did not receive more than a "fair return" on their property. In rejecting a claim by the railroad that the Act was a taking of their property, the Court decided that the excess income was not the "private property" of the railroad because the railroad was simply a trustee of the funds under the Transportation Act. In the instant case, though the OSLC retains some control over the funds, its role is akin to that of a trustee. The OSLC does not "own" the funds under any reasonable definition of that term. It is the administrator of the funds which flow in and out of Ohio as part of the GSLP program. The OSLC is a public entity that is not interested in making any sort of profit in its administration of the program. Instead, it has chosen to join with the federal government to administer the GSLP program, knowing that the funds are ultimately to be disposed of according to the decisions of the federal government. While there may be constitutional limits to the federal government's transfer of funds from state programs, these limits are not reached in this case. Here, the Secretary is transferring the funds from a federal program with a state administrator, not a state program. Thus, because of the significant federal regulation of the funds, we hold that the excess reserves do not constitute private property.

## B.

Even if the excess reserves were "private property," in order to violate the Constitution, the private property must be "taken" by the government. In *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 224–25, 106 S.Ct. 1018, 1025–26, 89 L.Ed.2d 166 (1986), an act modifying the terms under which an employer could withdraw from ERISA was challenged. In holding that the act did not constitute a taking of private property, the Supreme Court noted that even though the Act permanently deprived the employers of assets, "[i]n the course of regulating commercial ... affairs, Congress routinely creates burdens for some that directly benefit others," such as minimum wages and price controls. *Id.* at 223, 106 S.Ct. at 1025. In order to determine whether there was a taking, the Court established a three-prong test:

> (1) the economic impact of the regulation on the claimant;
>
> (2) the extent to which the regulation has interfered with distinct investment-backed expectations;
>
> (3) the character of the governmental action.

*Id.* at 225, 106 S.Ct. at 1026 (citations omitted).

Upon examination of these three factors, we find that the Secretary's action did not constitute a "taking" of the excess funds. First, the economic impact of the regulation is clearly to reduce the OSLC's reserves by approximately $26 million. However, the *Connolly* Court noted that the severity of the economic impact is the relevant factor; consequently, the Court took into account mitigating provisions in the statute. *Id.* Similarly, the instant case,

section 1072(e)(3) allows the Secretary to waive recovery of the excess reserves upon showing of a financial hardship by the guaranty agency. The OSLC failed to file waiver because it could not show any hardship. Further, there has been no showing in the record that the loss of the excess reserves would harm the operation of the OSLC—the excess funds were unnecessary *extra* insurance against future defaults.

The second factor, interference with the distinct investment-backed expectations, is also not met in the instant case. The *Connolly* Court noted that expectations are not great when employers "had more than sufficient notice not only that their plans were currently regulated, but also that withdrawal itself might trigger additional financial obligations." *Id.* at 227, 106 S.Ct. at 1027. Similarly, the OSLC was significantly regulated and on notice in the agreements that there might be future regulations or amendments. Furthermore, the OSLC is a non-profit, state governmental agency with no reasonable expectation of keeping its excess reserves. The funds come from the GSLP program, which is operated in conjunction with the federal government.

The third factor, the character of the governmental action, is also not met. The *Connolly* Court noted that under the statute in that case, the government did not permanently appropriate the employer's assets for its own use, but regulated the participants in the pension plans for the common good. *Id.* at 225, 106 S.Ct. at 1026. In the instant case, the OSLC argues that the federal government is taking the funds for its own use—to reduce the budget deficit. However, another reason for the transfer exists—to redistribute the funds. The excess funds go to a GSLP loan insurance fund established by 20 U.S.C. § 1081(a). Upon transfer from the guaranty agencies to the GSLP loan insurance fund, the funds could be used more immediately in states with agencies that do not have excess reserves. Accordingly, we conclude that the transfer of funds under section 1072(e) does not take private property without just compensation in violation of the Fifth Amendment.

## III.

The OSLC also argues that the enforcement provisions of the amendments are unconstitutional because they breach the OSLC's contractual rights to reinsurance payments. The OSLC posits that the abrogation of their contractual rights violates three provisions of the Constitution: the Takings Clause, the Due Process Clause, and section four of the Fourteenth Amendment.

## A.

■ The district court noted that the contract rights found in 20 U.S.C. § 1078(c) (an agency has "a contractual right against the United States" to reimbursement) are property under *Lynch v. United States*, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934). The Secretary responds that there was no abrogation of any "contract" for three reasons. First, the Secretary argues that the OSLC has no contractual right to the excess funds. Since OSLC could have chosen another method of transfer of the funds, the Secretary maintains that OSLC's *voluntary* choice of this method cannot be seen as an abrogation of the agreement. Second, the Secretary argues that withholding the funds was in accordance with the agreements. Third, the Secretary argues that section 1072(e) did not abrogate any contract created by section 1078 because the Act allowed for future amendments and changes.

We believe that section 1072(e) does not breach any "contract." In *Lynch*, Congress passed a statute that abrogated all outstanding insurance contracts in which the federal government had provided War Risk Insurance. In holding that the statute violated the takings clause, the court noted that "[v]alid contracts are property, whether the obligor be a private individual, a municipality, a State, or the United States." *Id.* at 579, 54 S.Ct. at 843. We think that the "contract" in the instant case, unlike that in *Lynch*, does not constitute *property* under the takings clause. Notably, the statute in *Lynch* totally re-

pealed the War Risk Insurance Act, while the 1987 Amendments merely altered the terms of the agreements. In addition, the insurance agreements in *Lynch* were between the federal government and individuals, whereas in the instant case, the agreements are between the Secretary and the OSLC concerning an appropriate way to share governmental authority in the administration of the GSLP. When viewed as a codification of the cooperative relationship between the federal and state agencies, the "contract" between the Secretary and the OSLC does not generate property rights under the takings clause. Even though section 1078 gives the agencies "contractual rights," they do not rise to the level of *property* under the Fifth Amendment. Instead, as with a number of other programs that involve the cooperation of the federal and state governments, the federal government has the power to change the terms of the relationship without taking the "property" of the state in violation of the Fifth Amendment.

▉ Not only are the agreements not "property" under the Takings Clause, but also there was no abrogation of the contract for two reasons. First, the Agreements allow the Secretary to withhold the reinsurance funds. Specifically, the Agreements provide that if the Secretary finds a failure of the OSLC to abide by federal law or regulations, he may take such action as is necessary to protect the interests of the United States, including "withholding payments to be made to [OSLC]." J.App. at 23, 28. Even if the OSLC has contractual rights under section 1078, the Secretary's actions do not violate the contract since such action is specifically provided for.

Second, and more importantly, the agreement did not foreclose the possibility of future Congressional acts, and as such, the 1987 Amendments were consistent with the agreement. In *Bowen v. Public Agencies Against Social Security Entrapment*, 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986), the State of California challenged an amendment to the Social Security laws. Previously, if a state obtained Social Security coverage for its employees, the law permitted that state to terminate the agreement providing coverage with two years notice. The amendments prevented the states from terminating these agreements. The State of California maintained that the old law created a "contractual right" that constituted private property under the Takings Clause of the Fifth Amendment. The Supreme Court ruled that the amendments to the act did not violate the Takings Clause because "Congress reserved the authority to amend" the statute and the agreements. *Id.* at 53, 106 S.Ct. at 2397. The Court noted that unlike *Lynch*, the *Bowen* case involved a provision of an act that "was part of a regulatory program over which Congress retained authority to amend in the exercise of its power to provide for the general welfare." *Id.* at 55, 106 S.Ct. at 2398.

The OSLC attempts to distinguish *Bowen* by arguing that in *Bowen*, Congress explicitly preserved the right to amend the act, while in the instant case, Congress "surrendered" the right to alter the "contract" through section 1078's language giving contractual rights to the OSLC. This distinction is inconsequential. While admittedly Congress did not expressly reserve the right to amend the statute in the future, it did not have to do so in order to preserve the power. The *Bowen* Court warned that "courts should be extremely reluctant to construe [the statute] in a manner that forecloses Congress' exercise of authority." *Id.* at 52, 106 S.Ct. at 2396. It noted that:

> [W]ithout regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms. Therefore, contractual arrangements, including those to which a sovereign itself is a party, 'remain subject to subsequent legislation' by the sovereign.

*Id.* (citations omitted). Upon review of the record, we conclude that Congress did not use unmistakable language to surrender its authority to amend. It simply gave a contractual right to the OSLC. Even without any reference in the Act to future amend-

ments, Congress retained the sovereign authority to amend and alter the regulatory scheme without unconstitutionally taking property.

In addition, under the reinsurance agreements, the OSLC agreed to be "bound by all changes in the Act or Regulations." J.App. at 21, 28. These agreements give notice to the OSLC of possible legislative changes. Under the OSLC's construction of the agreements as a normal contract, this is contractual language reserving to Congress the power to change that contract. That Congress did not expressly reserve the power in the Act is irrelevant under the OSLC's construction. Thus, we hold that the Secretary did not *abrogate* any "contractual rights," but merely *altered* the contract.

## B.

■ The district court also ruled that the withholding of the reinsurance funds violates the Due Process Clause of the Fifth Amendment. The court first decided that the Secretary's characterization of the withholding as a prospective reinsurance fee would violate the equal protection component of the Due Process Clause. 709 F.Supp. at 1418. However, on appeal the Secretary has renounced this characterization. Still remaining is the district court's determination that the "repudiation by the federal government of a valid contract [as accomplished in section 1072] is a violation of the Due Process Clause of the Fifth Amendment unless necessary for the exercise of the federal police power or other overriding federal interests." *Id.* at 1420.

Because we earlier concluded that the Secretary did not repudiate the "contract" with the OSLC, the enforcement of the transfer clearly has a rational relationship to the legitimate goals of reducing the deficit and redistributing the funds. Thus, we hold that section 1072 does not violate the Due Process Clause.

## C.

■ The district court also concluded that the defendant's repudiation of their

contractual obligations constituted a questioning of the public debt, thus violating section four of the Fourteenth Amendment. The court relied upon *Perry v. United States*, 294 U.S. 330, 351, 55 S.Ct. 432, 435, 79 L.Ed. 912 (1935), in which the Supreme Court ruled that the United States could not repudiate its contractual obligation to purchasers of bonds to redeem their bonds in gold. The *Perry* Court concluded that the government could not abrogate its contracts in an attempt to "lessen government expenditures," because it would question the public debt. *Id.* at 352–53, 55 S.Ct. at 435–36. Again, because we find no abrogation of the "contract" in the instant case, we conclude that there was no violation of section four of the Fourteenth Amendment.

## IV.

Accordingly, the decision of the district court is REVERSED, and REMANDED with instructions to remove the preliminary injunction and to dismiss the complaint.

RALPH B. GUY, Jr., Circuit Judge, concurring.

I agree with the result reached by the majority, but I would proceed from a single, precise conceptualization of the "property" at issue in analyzing the constitutional and contractual claims raised in this case. The court appears to view this dispute as a direct contest for the Ohio Student Loan Commission (OSLC) reserve fund. While I concede that the reserve fund balance plays an important role in this dispute, it seems to me that the reinsurance payments withheld by the Secretary, rather than the OSLC's cash reserves, constitute the "property" underlying this contest. The OSLC has not argued, nor could it argue, that the Secretary has raided its reserve fund. The language chosen by Congress constrains the Secretary's encroachment by instructing the Secretary merely to "direct the agency to eliminate such excess by any one or more of the [specified] methods, as selected by the guarantee agency[.]" 20 U.S.C.A. § 1072(e)(2) (Supp.1989). Only after the

OSLC refused to comply with such a directive did the Secretary refuse to provide the OSLC with reimbursement payments. In this action subsequently filed to obtain reinstatement of the payments on constitutional and contractual grounds, the OSLC could only contend that, because the Higher Education Act as amended contains a "clear indication that the legislature intend[ed] to bind itself contractually" to reinsure guarantee agencies, *see National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.*, 470 U.S. 451, 465–66, 105 S.Ct. 1441, 1451–52, 84 L.Ed.2d 432 (1985), state guarantee agencies have a property right in reimbursement for payments made to satisfy guarantees on loans in default. Although the OSLC might prefer to debate the Secretary's authority (or lack thereof) to raid the agency's reserve fund, this case turns exclusively on the Secretary's authority (or lack thereof) to withhold reimbursement payments. Thus, I would focus solely upon the propriety of the Secretary's refusal to reimburse the OSLC for guarantee payments made by the state agency.

As of 1986, Congress had statutorily pronounced that guarantee agencies such as the OSLC possessed "a contractual right against the United States" to reimbursement for guarantee payments and to administrative cost allowances. On December 22, 1987, however, a statutory qualification was engrafted upon these two previously unqualified rights. Specifically, both rights were made "subject to" the contemporaneously enacted provision concerning the reduction of excess cash reserves. *See* Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–203, Title III, § 3001(b), 101 Stat. 1330–38 (conforming amendments to 20 U.S.C. §§ 1078(c)(1)(A) & 1078(f)(1)(B)). Under these conditions added by Congress, the OSLC's continued receipt of reinsurance payments depended upon the OSLC's compliance with the Secretary's directives regarding reduction of the guarantee agency's reserve fund. *See* 20 U.S.C.A. § 1078(c)(1)(A) (Supp.1989). Even assuming that the OSLC possessed a property interest in reinsurance payments, *cf. Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934) ("Valid contracts are property, whether the obligor be a private individual, a municipality, a State, or the United States."), I do not believe that either Congress or the Secretary has disavowed or abrogated any obligation to furnish the OSLC with reinsurance. The imposition of additional conditions "[e]ven with respect to vested property rights" is well within the power of Congress. *See, e.g., United States v. Locke*, 471 U.S. 84, 104, 105 S.Ct. 1785, 1797, 85 L.Ed.2d 64 (1985). Here the Secretary has simply conditioned payment of reinsurance to the OSLC upon compliance with new conditions concerning reduction of the OSLC's reserve fund. This action neither works an impermissible taking of property nor constitutes a breach of contractual obligations.