**EDUCATION ASSISTANCE CORPORATION, A South Dakota Corporation, Appellant,**

v.

**Lauro F. CAVAZOS, Secretary of Education of the United States, Appellee.**

**No. 89–5393.**

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 15, 1989.

Decided April 10, 1990.

Thomas L. Shriner, Jr., Milwaukee, Wis., for appellant.

Neil H. Koslowe, Washington, D.C., for appellee.

Before McMILLIAN, JOHN R. GIBSON and BOWMAN, Circuit Judges.

McMILLIAN, Circuit Judge.

The Education Assistance Corporation (EAC) appeals from a final order entered in

the United States District Court[1] for the District of South Dakota granting summary judgment in favor of the Secretary of the United States Department of Education (Secretary). For reversal, EAC argues (1) the 1987 amendments to the Higher Education Act of 1965 violate its property rights under the fifth amendment by requiring EAC to transfer $6.6 million of "excess cash reserves" to the Secretary and by conditioning EAC's right to reimbursement on compliance with that requirement and (2) the Secretary's denial of EAC's request for a waiver from the transfer requirement was arbitrary and capricious. We affirm.

### I.

In 1965 Congress enacted the Higher Education Act, Pub.L. No. 89–329, 79 Stat. 1232 (1965) (codified as amended at 20 U.S.C. §§ 1071 *et seq.*) (the Act), which established a guaranteed student loan (GSL) program to assist students in financing their post-secondary education. The Act encourages state agencies or, in their stead, private non-profit corporations known as guaranty agencies to establish student loan guaranty programs by providing federally-subsidized interest payments and by authorizing the Secretary to reinsure guaranteed loans. 20 U.S.C. § 1071(a)(1) (1988).

EAC, formerly known as South Dakota Education Assistance Corporation, was organized as a non-profit corporation in 1978 and designated by the Governor of South Dakota as South Dakota's guaranty agency. On November 14, 1978, EAC entered into four contracts with the Secretary's predecessor, the Commissioner of Education (hereinafter the Secretary). The "basic contract" recognizes EAC as South Dakota's guaranty agency and provides that lenders who receive EAC's guaranty will also receive a federal interest subsidy. *See* 34 C.F.R. § 682.401 (1988). The "advances contract" entitles EAC to receive cash advances from the Secretary pursuant to 20 U.S.C. § 1072(a)(1) (1988) and 34 C.F.R. § 682.403 (1988).[2] The two remaining contracts are the heart of the GSL program. They obligate the Secretary to reimburse EAC for payments it makes in discharge of its guaranty obligations when a student defaults on a loan. EAC's original "reinsurance contract" provided for reimbursement of 80% of the amount expended by EAC in discharge of its insurance obligations. *See* 34 C.F.R. § 682.404 (1988). The "supplemental reinsurance contract" binds the Secretary to reimburse EAC for 100% of the amount paid to lenders as long as EAC's default rate does not exceed 5% of the loans insured by EAC. *See* 34 C.F.R. § 682.405 (1988). If the default rate rises to between 5% and 9%, EAC receives 90% reimbursement. *Id.* If the default rate exceeds 9%, EAC only receives 80% reimbursement. *Id.*

The contracts obligate EAC to comply with the statutory and regulatory requirements of the GSL program and "all changes in the Act or regulations in accordance with their respective effective dates."[3] They also give the Secretary permission to withhold reimbursements owing to EAC if "the [Secretary] finds that ... there has been a failure by [EAC] to comply with any of the provisions of this Agreement or applicable Federal law or

---

**1.** The Honorable Donald J. Porter, Chief Judge, United States District Court for the District of South Dakota.

**2.** These advances were authorized by Congress to enable new agencies to commence operations. 20 U.S.C. § 1072(a)(1) (1988). The Act gives the Secretary the discretion to set the terms and conditions of payment. 20 U.S.C. § 1072(a)(3) (1988). The Secretary is directed to seek repayment of these advances whenever appropriate in light of the maturity and solvency of the reserve fund for which the advance was made. *Id.* EAC's advances contract provides that the Secretary shall not require repayment until the sum of the advances exceeds 20% of EAC's outstanding insurance obligation. As of September 1988, EAC had received $2,291,918 in advances pursuant to its advances contract. All of this money had been paid by the Secretary prior to 1984.

**3.** This language is included in the basic contract and the reinsurance contract.

regulations." [4]

EAC's assets are held in a "reserve fund." *See* 34 C.F.R. § 682.410(a)(1) (1988). The assets include federal advances, reimbursements, and administrative cost allowances. Administrative cost allowances are paid by the Secretary to EAC pursuant to 20 U.S.C. § 1078(f) (1988) to help offset EAC's operating costs. In 1986, Congress made these allowances mandatory and gave the guaranty agencies a "contractual right" to receive them. Higher Education Amendments of 1986, Pub.L. No. 99–498, 100 Stat. 1268, 1381 (codified as amended at 20 U.S.C. § 1078(f)(1)(A) and (f)(1)(B) (1988)) (hereinafter 1986 Amendments). At the same time Congress confirmed that guaranty agencies have a "contractual right" to reimbursements from the Secretary. 1986 Amendments, 100 Stat. at 1376 (codified as amended at 20 U.S.C. § 1078(c)(1)(A) (1988)). EAC's reserve fund also consists of a single insurance premium not exceeding 3% of the loan, which is paid by the lender and passed on to the student borrower, and a portion (currently not greater than 30%) of the amount collected by an agency from a borrower after default on a loan for which the agency's claim was reimbursed by the Secretary. *See* 20 U.S.C. § 1078(b)(1)(H), (c)(2)(D), (c)(6)(A)(ii) (1988). EAC recently stopped charging lenders the 3% insurance fee in an effort to entice lenders to the program. EAC also is entitled to investment earnings on the reserve fund. *See* 20 U.S.C. § 1072(c)(3) (1988). Neither the State of South Dakota nor private investors have contributed to EAC's reserve fund.

In 1987 Congress amended the Act by adding 20 U.S.C. § 1072(e) (1988), the constitutionality of which is at issue in this case. The 1987 amendments, enacted as part of the Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–203, § 3001, 101 Stat. 1330, 1330–36 (1987), limit the amount of cash reserves a state or guaranty agency may maintain in its reserve fund. They were adopted after the Comptroller General reported to Congress that guaranty agencies had built up unnecessarily large cash reserves and some were using the funds for non-GSL purposes. *See* H.R. Conf.Rep. No. 495, 100th Cong., 1st Sess. 518, *reprinted in* 1987 U.S.Code Cong. & Admin.News 2313–1, 2313–1264 (hereinafter 1987 USCAAN). The amendments require the Secretary to determine a maximum cash reserve for each agency using fiscal year 1986 financial data and to recover the amount of reserves in excess of that maximum amount.[5] 20 U.S.C. § 1072(e)(1), (e)(2) (1988). An agency may transfer its excess reserves to the Secretary by any one of four methods: (1) repaying advances not otherwise required to be repaid, (2) withholding and cancelling claims for reinsurance otherwise payable, (3) reducing claims for administrative cost allowances, and (4) any other acceptable method such as a lump sum payment or the payment of

---

4. The following language is included in all four of EAC's contracts with the Secretary:

    If the [Secretary] finds that any of the assurances or representations made by [EAC] in connection with this Agreement are incomplete or incorrect in any material respect or that there has been a failure by [EAC] to comply with any of the provisions of this Agreement or applicable Federal law or regulations, [the Secretary] may take such action short of termination as may be necessary to protect the interests of the United States. Such action may include withholding payments to be made to [EAC] until adequate documentation therefor is provided or requiring that [EAC] reimburse the [Secretary] for any payments made, or any payments which the [Secretary] has become obligated to make, as a result of [EAC's] making such incomplete or incorrect statements or violating such provisions of this Agreement or applicable Federal law regulations.

5. An agency's maximum cash reserve is determined by the greater of:

    40 percent of the total amount paid by that agency on insurance claims during the preceding fiscal year;

    0.3 percent of original principal amount of loans that are insured by that agency and that are outstanding at the end of such preceding fiscal year;

    an amount which, when combined with all other parts of total agency reserves, equals 0.4 percent of such original principal amount; $500,000; or

    the amount required to comply with the reserve requirements of a State law as in effect on October 17, 1986.

    20 U.S.C. § 1072(e)(1) (1988).

additional reinsurance fees. 20 U.S.C. § 1072(e)(2). The total cash reserves recovered by the Secretary may not exceed $250 million, 20 U.S.C. § 1072(e)(4) (1988), and have been deposited in the student loan insurance fund established under the Act. The student loan insurance fund is used to reimburse guaranty agencies for defaulted loans. *See* 20 U.S.C. § 1081(a) (1988). The 1987 amendments expired automatically on September 30, 1989. Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–203, § 3002, 101 Stat. 1330, 1330–38.

A guaranty agency may request a waiver from the transfer requirement pursuant to 20 U.S.C. § 1072(e)(3) (1988). The Secretary is authorized to grant a waiver if (1) the agency's financial position has deteriorated significantly, (2) significant changes in economic circumstances or in the loan program render the agency's maximum cash reserve inadequate, or (3) the transfer would compel an agency to violate contractual obligations that require the agency to maintain a specified level of reserve funds. 20 U.S.C. § 1072(e)(3).

On December 22, 1987, EAC notified the Secretary that it considered the 1987 amendments to be an abrogation of the Secretary's contractual obligations and that it would not consent to incorporation of the transfer requirement into its existing contracts with the Secretary. To avoid any implication that it consented to the transfer requirement, EAC announced it would not guarantee any student loans after December 21, 1987. To ensure continued access to loans for the students in South Dakota, EAC arranged for the Pennsylvania Higher Education Assistance Agency to guarantee those loans which EAC would otherwise have guaranteed. On January 25, 1988, the Secretary suggested that EAC apply for a waiver rather than suspend its guaranty function. The Secretary also warned EAC that suspension of its guaranty obligations constituted a termination of the existing agreements and that the Secretary would accordingly not reinsure any loans guaranteed by EAC on or after December 21, 1987.

Meanwhile, the Secretary determined that EAC's reserve fund balance in fiscal year 1986 contained $6.6 million in excess of its maximum cash reserve calculated pursuant to 20 U.S.C. § 1072(e)(1)(A). In a letter dated February 16, 1988, the Secretary directed EAC to choose a method of transferring the $6.6 million excess cash reserves to the Secretary or request a waiver pursuant to 20 U.S.C. § 1072(e)(3).

On March 15, 1988, EAC requested a waiver from the transfer requirement. In support of its request, EAC submitted a study conducted by the accounting firm of Touche Ross & Co. which concluded that, without the $6.6 million, EAC's reserve fund would not be adequate to meet EAC's future insurance obligations. EAC also claimed that the transfer requirement would compel it to violate the minimum reserve balance it promised to the South Dakota Student Loan Corporation (SDSLC). SDSLC is a non-profit corporation, established in 1978, which operates a secondary market for student loans by purchasing the loans from private lenders. On September 26, 1988, the Secretary denied EAC's request for a waiver. EAC refused to transfer the $6.6 million to the Secretary, and the Secretary began withholding reimbursements on claims submitted by EAC for payments it made in discharge of its insurance obligations. By the time this appeal was taken, the Secretary had recovered the full $6.6 million.

EAC commenced this action on December 12, 1988, seeking a declaration that the Secretary's refusal to pay $6.6 million in reimbursement claims constituted a breach of contract and that the 1987 amendments deprived EAC of property without due process of law in violation of the fifth amendment. EAC also requested a money judgment for $6.6 million, the amount of the unpaid claims. EAC's third cause of action sought review of the Secretary's denial of EAC's waiver request. The parties filed cross-motions for summary judgment on all three causes of action, and the district court granted summary judgment for the Secretary. The district court held that the transfer requirement does not effect a "taking" without just compensation, that

the Secretary did not breach its contract with EAC, and that the Secretary's denial of EAC's waiver request was not arbitrary or capricious. This appeal followed.

## II.

We begin with the Secretary's denial of EAC's request for a waiver because resolution of that issue in EAC's favor would preclude discussion of EAC's constitutional claim. *See Jean v. Nelson,* 472 U.S. 846, 854, 105 S.Ct. 2992, 2996, 86 L.Ed.2d 664 (1984) (prior to reaching any constitutional questions, federal courts must consider non-constitutional grounds for decision). Our review of the Secretary's action is governed by the Administrative Procedure Act, 5 U.S.C. § 706 (1988), which authorizes us to set aside agency actions, findings, and conclusions if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Our standard of review is a narrow one, deferential to the agency's interpretation of its own regulations and only permitting reversal if the agency action is without a rational basis. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42–43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (*Motor Vehicle*); *Moore v. Custis,* 736 F.2d 1260, 1262 (8th Cir.1984). While we may give deference to the agency's interpretation of the statute which gives it the authority to act, *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), we have ultimate responsibility over questions of statutory interpretation and Congressional intent. *See* 5 U.S.C. § 706. We review the district court's decision upholding the Secretary's action *de novo,* and we base our *de novo* review on the administrative record that was before the district court. *Moore v. Custis,* 736 F.2d at 1262. After careful review of the administrative record and EAC's arguments on this issue, we hold that the Secretary's denial of EAC's request for a waiver was not arbitrary or capricious.

### A.

Title 20 U.S.C. § 1072(e)(3)(A)(ii) authorizes the Secretary to grant a waiver if "significant changes in the economic circumstances (such as a change in agency current cash reserves) or the loan insurance program render the [reserve fund] limitations inadequate for the continued functioning of the agency." In support of its request for a waiver under this provision, EAC submitted a report prepared by Touche Ross analyzing the adequacy of EAC's reserves as of September 30, 1987, and the impact of the transfer requirement on EAC's ability to meet its financial obligations over the next fifteen years. EAC also submitted its financial statements for fiscal years 1986 and 1987. Touche Ross concluded that EAC's reserve balance after transferring $6.6 million to the Secretary would not be adequate to meet EAC's future guaranty obligations.

Without addressing the Touche Ross report, the Secretary found that EAC "failed to demonstrate that it experienced a significant change in economic circumstances." The Secretary relied on EAC's financial statements which indicated that EAC's financial strength had improved during fiscal year 1986.[6] The Secretary also reviewed EAC's financial data from fiscal year 1987. If application of the statutory formula in 20 U.S.C. § 1072(e)(1)(A) to fiscal year 1987 had resulted in a lesser excess cash reserve amount than that previously determined for fiscal year 1986, the Secretary was prepared to waive the larger amount and apply the transfer requirement to EAC's fiscal year 1987 reserve fund balance. After calculating 40% of the total amount paid by EAC on insurance claims in fiscal year 1987 and subtracting that figure from EAC's total cash reserves for fiscal year 1987 less the amount of advances owing to the Secretary, the Secretary calculated excess cash reserves of over $8 million, $2 million above that calculated for fiscal year 1986. The Secretary therefore concluded

---

**6.** EAC's reserve fund balance increased from $6,846,606 on September 30, 1986, to $7,184,831 on September 30, 1987.

that EAC had not experienced a change in economic circumstances warranting a waiver of some or all of the $6.6 million in excess cash reserves for fiscal year 1986.

EAC argues that the Secretary's "narrow" reading of the waiver provision is contrary to Congressional intent as expressed in the House Conference Report and the statute.[7] *See* 1987 U.S.Code Cong. & Admin.News at 2313–1264 to 65. We disagree. We do not think Congress necessarily intended the Secretary to grant relief to an agency in EAC's financial position.[8] Congress adopted four alternative formulas for determining an agency's maximum cash reserve, formulas it believed would allow most agencies to continue to meet their financial obligations under the GSL program. *See* 20 U.S.C. § 1072(e)(1).[9] Congress provided for a waiver of the cash reserve limitation in three narrow circumstances. 20 U.S.C. § 1072(e)(3). While making clear that it did not want to "materially harm an agency's ability to fulfill its guaranty function," Congress gave the Secretary discretion to determine, on a case-by-case basis, when and to what extent waiver is necessary to prevent that harm from occurring. 1987 U.S.Code Cong. & Admin.News at 2313–1264.

The language of the particular waiver provision at issue here requires that EAC not only show that its maximum cash reserve balance is inadequate, but also that "a change in economic circumstances" renders it so. 20 U.S.C. § 1072(e)(3)(A)(ii). The Secretary's finding that EAC demonstrated no change in economic circumstances is supported by the record. EAC's financial statements show that its reserve fund increased rather than decreased over the course of fiscal years 1986 and 1987. That the Secretary did not address the Touche Ross report in its denial letter does not render the denial arbitrary or capricious because the Secretary's explanation for its decision, namely that EAC had not

7. The Conference Report states:

The agency's appeal may be based on a deterioration of financial position or significant changes in economic circumstances or its loan program which render the reserves, as limited by the bill, inadequate for continued functioning of the agency. The Managers expect that the Secretary will broadly exercise the authority to waive the requirement in order to prevent damage to the functioning of the guaranty agency.

For example, the Managers do not intend that the Secretary shall only grant relief if the agency would be forced to cease operations; such a narrow interpretation would not be in keeping with the intent of the Managers. The Secretary must assess whether reduction of cash reserves would materially affect the agencies; [sic] current and future ability to perform their vital role as the guarantors of student loans. The Secretary should consider such factors as ... composition of current and probable future student populations served by the guarantor, changes in sources of funds which diminish the guaranty agency's ability to have sufficient resources to meet lender's claims.... The Managers expect that in assessing appeals by guaranty agencies the Secretary will take into account their most recent available certified financial statements. The Managers wish to stress it is not the intention of the Congress to either materially harm an agency's ability to fulfill its function in the guaranteed student loan program or to so financially weaken an agency *so as to* impair its function.

H.R.Conf.Rep. No. 495, 100th Cong. 1st Sess. 518–19, *reprinted in* 1987 U.S.Code Cong. & Admin.News 2313–1264 to 65.

8. EAC certified to the Secretary that at the end of fiscal year 1988, it had cash reserves of $9,907,721 and total reserves (including receivables) of $11,057,749. At the same time, EAC's cumulative unreimbursed claims payments since 1978 when it first entered the program were $945,601. Reducing EAC's cash reserves by $6,607,592 would leave it with $3,300,129 or three times more than what it needed to pay unreimbursed claims over an 11–year period.

9. These formulas were based on the Comptroller General's report to Congress and a follow-up report by the General Accounting Office (GAO) establishing specific guidelines for reducing guaranty agency reserves without jeopardizing the cash flow the agency needs to meet expenses and guaranty obligations. The GAO based its cash flow analysis on a survey of agencies' recent default claims, and the reserve levels were developed to provide adequate reserves for agencies with the largest negative cash flows. Seventeen of the agencies analyzed experienced negative cash flows during either fiscal year 1984 or 1985, and were required to draw on reserves to meet expenses. The GAO found, however, that eight of the seventeen agencies could have offset further negative cash flows by increasing insurance premiums charged to lenders. Although in the past EAC charged lenders a 3% insurance premium, it recently discontinued this practice in an effort to recruit lenders.

demonstrated a change in economic circumstances, does not run counter to the findings of the Touche Ross report. *See Motor Vehicle,* 463 U.S. at 43, 103 S.Ct. at 2866. The Touche Ross report demonstrates no change in economic circumstances not already taken into account by the Secretary and Congress in calculating EAC's maximum cash reserve level. The report was aimed at quantifying the level of reserves required for EAC to meet the future reserve requirements of its loan portfolio and at determining whether EAC's reserve balance remaining after $6.6 million is transferred to the Secretary is adequate to meet EAC's future obligations. The report's conclusions merely contradict GAO's assessment, relied upon by Congress in calculating an agency's maximum cash reserve balance, of what reserve level is adequate for the continued functioning of the guaranty agency.[10] We agree with the district court that Congress did not intend to require the Secretary to reformulate for each individual guaranty agency a maximum cash reserve level. Congress intended the waiver provision in 20 U.S.C. § 1972(e)(3)(A)(ii) to apply only if circumstances arose after the GAO analysis that rendered GAO's calculations inadequate. We therefore hold that the Secretary's denial of a waiver under § 1072(e)(3)(A)(ii) was not arbitrary or capricious.

### B.

■ Congress also directed the Secretary to consider the guaranty agency's existing contractual obligations and to grant a waiver if, in transferring reserve funds, a guaranty agency would be compelled to violate a contractual obligation that requires the agency to maintain a specified level of reserve funds. 20 U.S.C. § 1072(e)(3)(A)(iii). In support of its request for a waiver under this provision, EAC submitted to the Secretary a copy of four Guaranty Reserve Agreements (GRAs) in force between EAC and SDSLC.[11] The Secretary found that the transfer requirement would not compel EAC to violate any of its obligations under the GRAs. EAC argues that the Secretary's interpretation of the language contained in each GRA regarding a minimum reserve fund balance is incorrect and that the transfer requirement would compel EAC to violate that language. We disagree.

The Secretary's interpretation of EAC's contractual obligations is adequately supported by the language contained in sections 5(i) and (ii) of each GRA, and therefore the Secretary's denial of EAC's request for a waiver under § 1072(e)(3)(A)(iii) was not arbitrary or capricious. The Secretary noted that GRA § 5(i) requires EAC to maintain in its reserve fund at least 2% of the unpaid principal amount of all student loans it insures *or* such lesser amount as agreed to by the indenture trustee.[12] EAC argues that the Touche Ross report negates any possibility that the trustee would agree to a reserve fund below 2% of the unpaid principal of all loans insured. The Secretary responds that whether the inden-

---

**10.** For instance, Touche Ross based its study on a different set of assumptions than did GAO, taking issue with GAO's assumption that future revenue is expected to cover the expenses of prior paid loans. Touche Ross instead matched revenue for new loans with future expenses associated with these loans, which it claimed is consistent with generally accepted accounting principles.

**11.** Each GRA was entered into on a different date in connection with separately secured issues of SDSLC's student loan revenue bonds, publicly offered and distributed.

**12.** GRA § 5(i) specifically states:

The Guarantee Fund shall be maintained at a minimum amount (hereinafter called the "Required Minimum Amount") as of any date of calculation equal to (A) two percent (2%) of the unpaid principal amount of all student loans insured or guaranteed by EAC, or (B) such lesser amount agreed to by the Trustee in writing, after the Trustee has examined the report of a firm of independent certified public accountants reasonably acceptable to the Trustee stating that, based on reasonable and appropriate assumptions, EAC will have sufficient cash available to carry out its guarantee function for so long as any Bonds remain Outstanding and Financed Student Loans are Guaranteed by EAC, and that the Guarantee Fund will be sufficiently funded at such Required Minimum Amount to cover the reasonably expected obligations of EAC on defaulted student loans guaranteed or insured by it.

ture trustee would have relied on the Touche Ross projections is purely speculative, and, therefore, the Touche Ross report cannot serve as a basis for|finding that the transfer requirement would *compel* EAC to violate its obligations under the GRAs. We agree with the Secretary.

The Secretary's finding that EAC would not be compelled to violate obligations owing to SDSLC is further supported by GRA § 5(ii). This section provides that EAC may only use the reserve fund for the purpose of fulfilling its guaranty obligations, including the repayment of any federal advances required by the Secretary. It further provides that if such use reduces the reserve fund below the two percent minimum, EAC shall take all steps necessary to restore the fund as rapidly as practicable.[13] EAC contends that satisfying the transfer requirement is not a permitted use of its reserve fund under GRA § 5(ii) because it constitutes neither the repayment of federal advances nor the fulfillment of EAC's obligations "upon its guarantee or insurance of student loans." We

do not believe the language in GRA § 5(ii) is so limited. We agree with the district court that the permitted uses under GRA § 5(ii) encompass all obligations under the Act, including the transfer requirement in 20 U.S.C. § 1072(e)(2). The Secretary's interpretation of GRA § 5(ii) as allowing EAC to dip below the 2% minimum in order to satisfy the transfer requirement, as long as it takes all practicable steps to replenish the fund, is rational and not arbitrary or capricious.

### III.

■ We turn now to the constitutional issue presented: whether the 1987 amendments to the Higher Education Act effect a taking of property without just compensation or a deprivation of property without due process of law within the meaning of the fifth amendment.[14] For the reasons discussed below we find that they do not.[15]

### A.

EAC challenges two governmental actions: (1) the passage of the 1987 amend-

---

**13.** GRA § 5(ii) specifically states:

The Guarantee Fund may be used by EAC solely and only for the purpose of, at any time, permitting it to fulfill its obligations (including the repayment of any advances from the federal government) upon its guarantee or insurance of student loans, including Financed Student Loans, and, if such use reduces the amount then on deposit in the Guarantee Fund to less than the then applicable Required Minimum Amount, EAC shall promptly take all steps necessary to restore the amount then on deposit in the Guarantee Fund to not less than the Required Minimum Amount as rapidly as is practicable under the circumstances then in existence. Such steps shall include, but not be limited to, continuation or imposition (beginning with the next academic year) of premiums on the guarantee or insurance of student loans at a reasonable rate, which will be sufficient to cure, at the earliest practicable date, any deficiency not covered by the application of other moneys available to EAC, and the retention of all earnings on and income from the investment of amounts on deposit in the Guarantee Fund.

**14.** EAC's constitutional claim was plead under the due process clause of the fifth amendment. In its motion for summary judgment, EAC argued that the Secretary's actions constitute a "taking" without just compensation in violation of the fifth amendment. In its brief before this

court EAC argues that the Secretary's actions violate the fifth amendment "whether analyzed under Due Process Clause or Takings Clause cases." Brief for Appellant at 34. Because we hold that the property affected by the 1987 amendments is not "property" for purposes of either clause, we need not apply the distinct standards of review that have been developed by the Supreme Court over the years. *Compare Pension Benefit Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984) (due process clause) *with Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1985) (takings clause).

**15.** Several district courts have addressed similar constitutional challenges by other guaranty agencies throughout the nation, and have reached different results. *Compare Great Lakes Higher Educ. Corp. v. Cavazos,* 711 F.Supp. 485 (W.D.Wis.1989) *and Connecticut Student Loan Found. v. Cavazos,* Civil No. H–89–182 (D.Conn. Jan. 10, 1990) (1990 WL 66584) (holding 1987 amendments constitutional) *with Ohio Student Loan Comm'n v. Cavazos,* 709 F.Supp. 1411 (S.D.Ohio 1988) (holding 1987 amendments unconstitutional). Two district court decisions holding the 1987 amendments unconstitutional were reversed by the Fourth Circuit in *South Carolina State Education Assistance Authority v. Cavazos,* 897 F.2d 1272 (4th Cir.1990) (consolidated with Nos. 89–2976, 89–2978, 89–2982).

ments to the Act which require EAC to transfer $6.6 million from its reserve fund to the Secretary (the transfer requirement) and (2) the withholding by the Secretary of $6.6 million in federal reimbursements after EAC refused to comply with the transfer requirement. On appeal, EAC emphasizes the withholding of reimbursements, arguing that withholding reimbursements to satisfy the transfer requirement constitutes an unconstitutional abrogation of the Secretary's contractual duty to reimburse EAC on loans guaranteed prior to December 22, 1987. We find it logical to consider first whether Congress can, consistently with the fifth amendment, require EAC to relinquish $6.6 million from its reserve fund. We will then consider whether the Secretary's method of collecting the $6.6 million in excess cash reserves, that is, by withholding reimbursements, is an unconstitutional abrogation of the Secretary's contractual obligations.

### 1.

EAC argues that the fifth amendment prohibits Congress from requiring EAC to relinquish $6.6 million in "excess cash reserves." Whether analyzed as a deprivation of property without due process or a taking without just compensation, we must first identify the property affected by the governmental action in order to decide whether it constitutes "property" deserving protection of the fifth amendment. *See Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1000–04, 104 S.Ct. 2862, 2871–73, 81 L.Ed.2d 815 (1984) (addressing first whether Monsanto had a property interest in data submitted to the U.S. Environmental Protection Agency). The property targeted by the 1987 amendments is EAC's reserve fund. After examining the composition and nature of EAC's reserve fund, we conclude that it does not constitute property deserving protection of the fifth amendment's due process or takings clause. Our opinion is consistent with the Fourth Circuit's decision in *South Carolina State Education Assistance Authority v. Cava-*

*zos,* 897 F.2d 1272 (4th Cir.1990) (consolidated with Nos. 89–2976, 89–2978, 89–2982) (*South Carolina v. Cavazos* ).

The Secretary argues that EAC's excess reserves come from insurance premiums EAC has collected over the years, "a small amount of cash from other sources," and investment earnings on its total reserve fund. Brief for Appellee at 25–26. Because the excess reserves do not include administrative cost allowances or federal reimbursements which EAC has a contractual right to receive, the Secretary argues, EAC has no property interest in the excess reserves. *Id.* at 25. We are not persuaded by this argument because EAC's reserve fund is unsegregated and we cannot therefore trace the various sources of the $6.6 million targeted by the transfer requirement.[16] Instead of considering whether and to what extent EAC has a property interest in the various sources that supply its reserve fund, we consider EAC's interest in the reserve fund as a whole.

A guaranty agency's "reserve fund" is entirely a creature of federal regulation. Title 34 C.F.R. § 682.410(a)(1) (1988) requires the guaranty agency to establish and maintain a "reserve fund" and to credit to that fund payments from the federal government, collections on defaulted loans, investment earnings, and gifts or grants from other sources. Title 34 C.F.R. § 682.410(a)(2) and (a)(3) (1988) restrict the agency's use of reserve fund assets to GSL purposes such as paying default claims, refunding overpayments of insurance premiums, repaying advances made by the Secretary, and administering the agency's guaranty program. Federal regulation authorizes the agency to invest the assets in its reserve fund in low-risk securities only. 34 C.F.R. § 682.419(a)(5) (1988). In doing so, the agency must exercise the same level of care as a fiduciary "charged with the duty of investing the money *of others.*" *Id.* (Emphasis added).

Because of the extensive federal regulation of EAC's reserve fund, we hold that

---

**16.** Only federal advances are accounted for separately in the reserve fund. 34 C.F.R. § 682.410(a)(4)(ii) (1988).

EAC has no ownership interest in its reserve fund that entitles EAC to protection under the fifth amendment. EAC argues that federal regulation of an individual's use of property does not automatically deprive that property of the fifth amendment's protections against government taking. We agree with EAC that to so hold would allow the government to "poach the coffers" of financial institutions, insurance companies, and non-profit corporations. Brief for Appellant at 42. Such a narrow reading of property protected by the fifth amendment is clearly not warranted. *See United States v. 564.54 Acres of Land,* 441 U.S. 506, 99 S.Ct. 1854, 60 L.Ed.2d 435 (1979) (non-profit corporation entitled to compensation for the government's condemnation of its land for public recreation project). However, EAC's assertion that government regulation, "no matter how pervasive" cannot transform property into "public property" goes too far. Brief for Appellant at 43. Whether certain property is within the ambit of the fifth amendment depends on the unique circumstances of each case. In this case, several factors convince us that EAC has no fifth amendment property interest in the excess cash reserves. They include (1) the purpose of the guaranty agency and its reserve fund (to service the federally-created GSL program), (2) the understandings of the agencies expressed in their agreements with the Secretary, and (3) the regulations governing the composition and nature of the reserve fund.

When considering whether certain property is protected by the fifth amendment, we are mindful that property interests are not created by the Constitution, but are instead defined by "existing rules or understandings that stem from an independent source...." *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1001, 104 S.Ct. 2862, 2871, 81 L.Ed.2d 815 (1984) (*Ruckelshaus*) (citing *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)). That independent source may be state law, as in *Ruckelshaus,* or it may be, as in this case, federal law which defines a person's relation to a particular thing. *See Flemming v. Nestor,* 363 U.S. 603, 608–11, 80 S.Ct. 1367, 1371–72, 4 L.Ed.2d 1435 (1960) (considering the statutory scheme created by the Social Security Act and concluding that an employee's right to benefits under the Act is not an accrued property right protected by the fifth amendment). Here, federal law dictates the existence, content and uses of EAC's reserve fund and provides that the fund be maintained by EAC for the limited purpose of servicing the GSL program established by Congress. EAC's interest in the fund is analogous to that of a trustee holding money for the benefit of another. In this case, the beneficiary is the general public. In *Dayton–Goose Creek Ry. v. United States,* 263 U.S. 456, 484, 44 S.Ct. 169, 174, 68 L.Ed. 388 (1924) (*Dayton–Goose Creek*), the Supreme Court held that a rail carrier's interest in excess profits is not property under the fifth amendment because Congress declared the carrier to be only a trustee for earnings in excess of a fair rate of return. Describing the Transportation Act of 1920 under attack in *Dayton–Goose Creek,* the Supreme Court noted:

> It aims to give the owners of the railways an opportunity to earn enough to maintain their properties and equipment in such a state of efficiency that they can carry well this burden. To achieve this great purpose, it puts the railroad systems of the country more completely than ever under the fostering guardianship and control of the Commission....

*Dayton–Goose Creek,* 263 U.S. at 478, 44 S.Ct. at 172.

In addition to the statutes and regulations governing the GSL program, EAC's own agreements with the Secretary help us define its interest in the reserve fund. EAC agreed to be bound by all subsequent changes in the Act, and must have anticipated that some of those changes would impact its reserve fund balance. Indeed such changes have occurred. In 1986, Congress demanded that agencies pay the government, from their reserve fund, an insurance premium. 1986 Amendments, 100 Stat. at 1380 (codified at 20 U.S.C. § 1078(c)(9) (1988)). In the same year, the

Secretary promulgated regulations strengthening the requirement that agencies exercise due diligence in collecting loans. *See* 34 C.F.R. §§ 682.402, 682.410, 682.411 (1988). Failure to satisfy the due diligence requirements allows the Secretary to withhold reimbursements. 34 C.F.R. §§ 682.402(h)(1)(iv) and 682.406(a)(1) (1988). In light of these circumstances, we hold that EAC has no fifth amendment property interest in its reserve fund. Consequently, Congress' mandate that EAC relinquish $6.6 million in excess cash reserves does not violate either the fifth amendment's takings or due process clause.

### 2.

■ We turn now to whether the method the Secretary used to enforce the transfer requirement, withholding reimbursements EAC would otherwise have been eligible to receive, is an unconstitutional abrogation of EAC's contractual rights against the government. We agree with the district court that the withholding of reimbursements does not constitute a breach of EAC's contract with the Secretary. Although the 1987 amendments did modify statutory language confirming that guaranty agencies have a "contractual right" to federal reimbursements,[17] the amendments did not alter EAC's pre-existing legal rights. As already noted, EAC's contractual right to reimbursement was always contingent on EAC's compliance with federal law and regulations. In its agreements with the Secretary, EAC agreed to be bound by "all changes in the Act or regulations in accordance with their respective effective dates." EAC also gave the Secretary the right to withhold payments owing to EAC if the Secretary finds that "there

has been a failure by [EAC] to comply with any of the provisions of this Agreement or applicable Federal law or regulations." We agree with the district court that this language gives the Secretary the right to withhold reimbursements until EAC is in compliance with the transfer requirement and therefore the withholding does not constitute a breach of contract.

EAC argues that the contract language does not give the Secretary the right to withhold reimbursements on loans that were guaranteed *before* the transfer requirement went into effect. Therefore, EAC argues, the withholding constitutes a breach of contract and a violation of the fifth amendment.[18] Even were we to agree with EAC, however, that the 1987 amendments alter the terms of EAC's contracts with the Secretary by allowing the Secretary to withhold reimbursements until EAC transfers its excess reserves, we do not find a violation of the fifth amendment.

■ Whether a contractual right against the United States constitutes a vested property right for fifth amendment purposes depends on whether Congress reserved power to alter the terms of the contract. In *Bowen v. Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986) (*Bowen*), the Supreme Court concluded that Congress' express reservation of authority to alter the provisions of the Social Security Act, combined with Congress' need to be responsive to "ever-changing conditions" affecting the social security program, rendered California's contractual right to withdraw from the social security program subject to repeal by Congress without the pro-

17. As amended in 1987, 20 U.S.C. § 1078(c)(1)(A) (1988) states: "The guaranty agency shall, subject to 20 U.S.C. § 1072(e) of this title, be deemed to have a contractual right against the United States ... to receive reimbursement according to the provisions of this subsection." 20 U.S.C. § 1078(c)(1)(A) (underscored language added by Pub.L. No. 99–498, 100 Stat. at 1381).

18. Clearly, a contractual right against the United States can constitute property within the meaning of the fifth amendment. In *Lynch v.*

*United States*, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1933), the Supreme Court held that the plaintiffs, who had paid the government monthly premiums in return for its promise to insure plaintiffs against death or total disability arising from World War I, had a contractual right to receive benefits from the government which was protected by the fifth amendment. *Id.* at 577, 579, 54 S.Ct. at 842, 843. The Supreme Court struck down Congress' attempt to relieve the government of liability on the contracts without compensating the plaintiffs. *Id.* at 580, 54 S.Ct. at 844.

tections contained in the fifth amendment. *Id.* at 51–52, 106 S.Ct. at 2396 (quoting *Flemming v. Nestor,* 363 U.S. 603, 610, 80 S.Ct. 1367, 1372, 4 L.Ed.2d 1435 (1960)).

Unlike the facts in *Bowen,* Congress did not expressly reserve the right to amend or repeal the Act. We agree with the Fourth Circuit, however, that Congress implicitly reserved the right to amend the Act and alter the terms of EAC's agreement with the Secretary.[19] *South Carolina v. Cavazos,* 897 F.2d at 1275. Our holding is supported by the Supreme Court's pronouncement in *Bowen* that "contracts should be construed, if possible, to avoid foreclosing exercise of sovereign authority." *Bowen,* 477 U.S. at 52–53, 106 S.Ct. at 2396–97. The Supreme Court went on to note that this proposition takes on "added force when the arrangement pursuant to which the Government is claimed to have surrendered a sovereign power is one that serves to implement a comprehensive social welfare program affecting millions of individuals throughout our Nation." *Id.* at 53, 106 S.Ct. at 2397.[20]

That Congress intended to reserve its authority is implicit in the purpose and structure of the GSL program and from Congress' exercise of that authority prior to the amendments in question. As the district court recognized, the GSL program is essentially a social welfare program designed to help the nation's youth gain access to higher education that they otherwise could not afford. Like the Social Security Act, the Higher Education Act needs to be responsive to "ever-changing" conditions. *See id.* at 51, 106 S.Ct. at 2396; *Flemming v. Nestor,* 363 U.S. at 610, 80 S.Ct. at 1372. Prior to the amendments in question, Congress took advantage of its power to modify the terms of the Secretary's agreements with the guaranty agencies when in 1986 it amended the Act to impose a reinsurance fee on guaranty agencies to be paid from their reserve funds. 1986 Amendments, 100 Stat. at 1380. Given the Supreme Court's reluctance in *Bowen* to require an express reservation, we find that Congress never intended to relinquish its authority to impose additional requirements on guaranty agencies not contemplated in their agreements with the Secretary.

█ Having concluded that Congress reserved the right to modify the terms of EAC's agreement with the Secretary, we turn to whether Congress' exercise of that authority in this instance, namely conditioning EAC's right to reimbursement on compliance with the transfer requirement, exceeds the limits on Congress' power to modify government obligations.[21] Con-

---

**19.** The district court found such a reservation in regulations promulgated pursuant to the Act and in the language of the Secretary's contracts with EAC. *See* 34 C.F.R. § 682.400(d) (1988) (providing that agreements between guaranty agencies and the Secretary are subject to subsequent changes in the Act). We are not convinced, however, that an agency, without any direction from Congress, may reserve the right to alter the terms of its agreements with private individuals. *See Lynch v. United States,* 292 U.S. 571, 578, 54 S.Ct. 840, 843, 78 L.Ed. 1434 ("[N]o power to curtail the amount of the benefits which Congress contracted to pay was reserved to Congress; and none could be given by any regulation promulgated by the Administrator.").

**20.** Dicta in the Supreme Court's opinion intimates that rather than having to find an express reservation of the right to amend, we need only find that Congress did not surrender its sovereign power in unmistakable terms. *Bowen v. Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 52, 106 S.Ct. 2390, 2396, 91 L.Ed.2d 35 (1986) (citing *Merrion v. Jicarilla Apache*

*Tribe,* 455 U.S. 130, 147–48, 102 S.Ct. 894, 906–07, 71 L.Ed.2d 21 (1982)). In other words, Congress maintains the right to alter the terms of a contract entered into by the United States under Congress' authority unless it has explicitly waived that right in unmistakable terms. No such waiver can be found in the Act.

**21.** The limits on Congress' ability to alter by statute the terms of a private agreement entered into with the United States were first enunciated in the *Sinking–Fund Cases,* 99 U.S. 700, 721, 25 L.Ed. 496, 504 (1878). Although the Supreme Court upheld a statute requiring the Union Pacific Railroad Company to set aside a portion of its income in a "sinking-fund" in order to ensure that the company would be able to pay off its debts, the Court noted, "[i]n so doing [Congress] cannot undo what has already been done, and it cannot unmake contracts that have already been made, but it may provide for what shall be done in the future, and may direct what preparation shall be made for the due performance of contracts already entered into." *Id. See also Perry v. United States,* 294 U.S. 330, 350, 55 S.Ct.

gress is not free to entice a party into a contract by making certain pledges and then withdraw those pledges. *See Perry v. United States,* 294 U.S. 330, 350, 55 S.Ct. 432, 434, 79 L.Ed. 912 (1934) (*Perry* ). In *Perry,* the Supreme Court noted that Congress is "free to reduce gratuities deemed excessive [b]ut ... without power to reduce expenditures by abrogating contractual obligations of the United States." *Id.* at 352, 55 S.Ct. at 436. The Supreme Court reiterated in *Bowen* that "Congress does not have the power to repudiate its own debts, which constitute 'property' to the lender, simply in order to save money." *Bowen,* 477 U.S. at 55, 106 S.Ct. at 2398 (citing *Perry,* 294 U.S. at 350–51, 55 S.Ct. at 434–35).

We do not believe the language in the 1987 amendments conditioning EAC's contractual right to reimbursement on compliance with the transfer requirement repudiates a debt of the United States. Although Congress has added another condition to EAC's contractual right to reimbursement, the condition does not amount to a complete unmaking of the contract admonished by the Supreme Court in the *Sinking-Fund Cases,* 99 U.S. at 720–21 and in *Bowen,* 477 U.S. at 55, 106 S.Ct. at 2398. The purpose of the 1987 amendments was not to relieve the government of its obligation to reimburse guaranty agencies. Indeed EAC still has a contractual right to reimbursement. Rather, the purpose of the amendments was to recapture funds being held by the agencies that Congress deemed were not necessary to the continued functioning of the agency. 1987 USCCAAN at 2313–1264. *Cf. Bowen v. Gilliard,* 483 U.S. 587, 107 S.Ct. 3008, 97 L.Ed.2d 485 (1987) (addressing the constitutionality of a requirement in the Deficit Reduction Act of 1984 that a family's eligibility for welfare benefits take into account the income of parents and siblings living in the same house). The amendments merely add to the numerous statutory and regulatory requirements with which a guaranty agency must comply. Only the enforcement of the amendments involves the withholding of reimbursements. Congress was free to build in some method of enforcing the transfer requirement, and we hold that the withholding of reimbursements until the excess reserves are recaptured was a constitutionally permissible method of enforcement. *See United States v. Locke,* 471 U.S. 84, 107, 105 S.Ct. 1785, 1799, 85 L.Ed.2d 64 (1984) ("Regulation of property rights does not 'take' private property when an individual's reasonable, investment-backed expectations can continue to be realized as long as he complies with reasonable regulatory restrictions the legislature has imposed.").

### IV.

For the reasons stated above, we affirm the decision of the district court. We hold that the Secretary's denial of EAC's request for a waiver was not arbitrary or capricious. We also hold that the reserve fund is not property for purposes of the fifth amendment and that the Secretary did not breach its contract with EAC by withholding reimbursements in order to enforce compliance with the transfer requirement.

---

432, 434, 79 L.Ed. 912 (1934) (striking down an attempt by Congress to abrogate the gold clause in government bond obligations).